Argued November 30, 1970, reversed and remanded May 26, 1971

ROCKHILL, *Appellant, v.* POLLARD,
*Respondent.*
485 P2d 28

In Banc

F. Gordon Cottrell, Judge.

*Max S. Taggart, II*, Springfield, argued the cause for appellant. With him on the brief were Sanders, Lively & Wiswall.

*Richard Bryson*, Eugene, argued the cause for respondent. With him on the brief was Windsor Calkins.

McALLISTER, J.

The question posed here is whether plaintiff made out a prima facie case that the defendant's outrageous conduct caused her severe emotional distress. The lower court granted a nonsuit at the conclusion of plaintiff's case. We think the issue should have been submitted to the jury.

In *Pakos v. Clark*, 253 Or 113, 453 P2d 682 (1969), this court recognized the tort of outrageous conduct and used as a test of its limits 1 Restatement of Torts 2d, § 46:

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

"(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

"(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

"(b) to any other person who is present at the time, if such distress results in bodily harm."

In deciding whether the trial court in this case properly granted the motion for involuntary nonsuit we view the evidence in a light most favorable to plaintiff, accepting as true all of plaintiff's competent evidence and every reasonable inference of fact which can be drawn from it. *Pakos v. Clark*, supra, 253 Or at 116. There is competent evidence tending to prove the facts hereinafter set out.

Plaintiff, her 10-month-old daughter Marla, and her mother-in-law Christine Rockhill were injured in an automobile accident on the evening of December 16, 1967. Plaintiff and her mother-in-law suffered cuts and bruises; Marla was rendered unconscious. Plaintiff's husband, a Navy-trained medical technologist who was also a passenger in the car, testified that immediately after the accident Marla was completely lifeless and he thought she was dead. He tried unsuccessfully to rouse her; she did not respond at all, even to pinches on the arms and legs.

A passing motorist took plaintiff, Christine Rockhill, and Marla to Junction City and made arrangements for them to be seen by the defendant, Dr. Pollard. They met Dr. Pollard at his Junction City office shortly before 9 o'clock in the evening.

Both plaintiff and Christine Rockhill testified that defendant was rude to them from the moment they met him; plaintiff testified:

"And the first thing he looked at us, and he had a real mean look on his face, and this is what he said. He said, 'My God, women, what are you doing out on a night like this?' * * * and my mother-

in-law tried to explain to him why we were on the road, and her and I both pleaded to him."

Without making any examination, defendant told them there was nothing wrong with any of them.

Marla was still unconscious at this time. According to plaintiff:

"She was very lifeless. I was saying her name, and she wouldn't respond at all. Her eyelids were a light blue. She was clammy, very cold.

"In fact, I thought she was dead at the time."

Christine Rockhill also testified that Marla appeared lifeless, and was noticeably blue around the eyes. Nevertheless, plaintiff testified that she had to ask defendant several times to examine the child. When he finally agreed to do so, plaintiff took her to the examining room and removed her clothes.

"* * * He took a stethoscope and laid it on her heart, and that was all he did then, and then he took a knee hammer and put it on her knees, but there wasn't any response at all, and that is what his examination consisted of."

While plaintiff was dressing the child after this examination, Marla suddenly vomited a considerable amount. Without any further examination of the child or of the vomited material, defendant told plaintiff that there was nothing wrong, and that the vomiting had been caused by overfeeding.

Defendant never examined plaintiff or her mother-in-law or suggested that they get treatment for themselves elsewhere, although it was obvious that they were injured. Both were limping. Plaintiff was bleeding from cuts on her face and inside her mouth, and had visible bruises on her mouth and her knee.

Christine Rockhill was bleeding from a cut on her forehead. Defendant insisted several times that there was nothing wrong with them. Although a later examination revealed that their injuries were not serious, the cut in plaintiff's mouth did require suturing. However, defendant's attention to their injuries was limited to directing Christine Rockhill to "Get in there and clean yourself up. You are a mess."

Nor did defendant give them any advice about care or further attention for Marla, even when asked. Plaintiff testified:

"* * * The doctor was out of the room, and I told her [Christine Rockhill], I says, 'We have got to get help for this baby,' and she said, 'Well, what are we going to do?'

"And the doctor came back in the room, and she asked the doctor, she says, 'What are we going to do?' And he just shrugged his shoulders and said he didn't know, * * *."

When Christine Rockhill suggested that her brother would pick them up at defendant's office, defendant said, "My God, woman, I can't stay here until somebody comes and gets you." Although the temperature was below freezing and Marla's clothing and blanket were wet with vomit, he told them to wait outside by a nearby street light while someone came from Springfield to get them.

Forced to leave defendant's office, they found an open service station where they waited until plaintiff's husband found them about twenty minutes later and took them to a Eugene hospital. Plaintiff's husband testified that when he picked them up Marla's condition was the same as it had been immediately after the accident. Based on her pallor, the clamminess

of her skin, and the "complete limpness of the body," it was his opinion that the child was in shock.

Marla was examined in the emergency room at Sacred Heart Hospital in Eugene by Dr. White. Dr. White testified that when he first saw her she was pale and listless and only semi-conscious, and appeared to be suffering from moderately severe shock. He found a bruise over the right eye and a swelling behind the right ear. He concluded after his initial examination that there was a strong possibility that she had suffered a head injury, and that she should receive vigorous medical treatment without delay. He also testified in response to hypothetical questions that expert treatment should have been obtained immediately and that it was hazardous to take the child out into subfreezing weather in wet clothing.

Plaintiff was given emergency treatment at the hospital and released. Marla spent about a week in the hospital, undergoing surgery to elevate a depressed skull fracture. Her recovery was apparently satisfactory.

Concerning the conduct which will give rise to liability, the Restatement comments include the following general summary of the case law:

> "* * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " Comment d.

We think the above summary is of minimal aid in marking the limits of extreme and outrageous conduct which will support an action. It is composed of inconsistent generalities with different connotations for different people. The last sentence is especially suspect. Many members of the community would classify as outrageous conduct which others would describe as rude, callous, or obnoxious. On the other hand, "utterly intolerable in a civilized community" swings to the other end of the continuum and would seem to exclude much conduct that to us should be classified as actionable.

1. We need a simpler test and think it best for this case to merely hold that the conduct must be outrageous in the extreme. It is our impression that the test for liability in these cases can only be worked out on a case to case basis. Here we must determine whether defendant's conduct was so extreme as to warrant the imposition of liability for any severe emotional distress caused thereby.

2. An important factor in this case is the particular relationship between the parties. Defendant had come to his office for the express purpose of rendering professional aid to the victims of an automobile accident. He met a distraught mother with an unconscious baby who was totally dependent on him to diagnose the baby's condition and do something about it. Defendant was under a professional obligation to plaintiff—they were not dealing at arm's length.

Under these circumstances we think that a jury could find that defendant's conduct was outrageous in the extreme. Defendant contends that the evidence discloses at most rudeness and a mistaken diagnosis. Plaintiff, however, is not attempting to recover for her hurt feelings at defendant's rudeness or for any harm she or the baby suffered as a direct result of defendant's failure to diagnose their injuries properly. Her complaint charges him with abandoning her and her child, when he knew or should have known that they were in need of medical treatment. She charges that defendant, by his behavior, intentionally or recklessly caused her severe emotional distress. Defendant's rudeness is simply evidence of his intention or recklessness; we think the jury could find that his statement that there was nothing wrong with the child was more than simply a mistaken diagnosis. It could infer that he refused to give or suggest any treatment even though he must have known that there was a possibility the child had been seriously injured.

We have found no cases which are factually similar to the present case. The best recent discussion of the outrageous conduct cases is in Prosser, Law of Torts (3d ed 1964) 47-54. See, also, the leading article documenting the emergence of a legal recognition of the interest in freedom from mental and emotional distress. Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv L Rev 1033 (1936). Many of the cases can be classified on the basis of their facts —outrageous practical jokes, oppressive behavior in credit collection and business relations, threats of physical harm, abusive or alarming behavior toward or in the presence of ill persons or pregnant women, etc. This case could be described as involving callous behavior toward a plaintiff, already distraught, who

had a right under the circumstances to expect consideration and assistance. Somewhat similar is *Wood v. United Air Lines, Inc.*, 404 F2d 162 (10th Cir 1968) in which an airline official told the family of a passenger who had been killed in a crash that deceased had not been a passenger on the plane, and suggested the possibility that she had picked up with a strange man instead of taking the plane. Reviewing a summary judgment for defendant, the court had before it only affidavits. It held that under Utah law, including the rule stated in section 46, defendant might be liable depending on the precise circumstances under which the statements were made and that summary judgment had been improper.

Another leading case is *Savage v. Boies*, 77 Ariz 355, 272 P2d 349 (1954) in which law enforcement officers, in order to get plaintiff to accompany them to a hospital to be confined as a mental patient, told her that her husband and child had been badly injured and were patients at the hospital. The *Savage* case is similar to this one in that it involves a disregard for the plaintiff's feelings under particularly trying circumstances.

There is very little authority in this state which bears on the questions in this case. In *Pakos v. Clark*, supra, it was held that a nonsuit had been properly granted under very different facts. Many of plaintiff's complaints in that case were frivolous; the most serious single item of conduct, a threat to have plaintiff put "back in the insane asylum" and to turn his children over to the juvenile authorities, apparently took place after plaintiff had made quite a nuisance of himself. The court said the defendant's conduct was not outrageous, and that plaintiff had suffered no severe distress.

This court in *Hovis v. City of Burns*, 243 Or 607, 415 P2d 29 (1966) recognized a cause of action for the mental anguish caused by unauthorized or negligent handling of the body of a deceased spouse.

The special duties owed by a physician were considered significant in *Noe v. Kaiser Foundation Hosp.*, 248 Or 420, 435 P2d 306, 27 ALR3d 1268 (1967) in determining when a case is an appropriate one for punitive damages. It seems quite appropriate to consider those special duties also in deciding what behavior may be found to be extreme or outrageous. The object of a cause of action as described in § 46 is to compensate for real suffering intentionally or recklessly caused by socially intolerable behavior which invades plaintiff's interest in peace of mind. Certainly a physician who is consulted in an emergency has a duty to respect that interest, at least to the extent of making a good-faith attempt to provide adequate treatment or advice. We think a jury could infer from the evidence that defendant wilfully or recklessly failed to perform that duty.

3. Plaintiff must show not only that defendant's conduct was outrageous, but also that she in fact suffered emotional distress as a result, and that it was severe. 1 Restatement of Torts 2d, § 46, comment j. There is not much evidence on this point, but it is direct and the court must take it as true. Plaintiff, corroborated by her husband, testified that as a result of defendant's behavior she became nervous and had to take tranquilizers, and that her nervousness caused sleeplessness and loss of appetite over a considerable period of time up to the date of the trial. Defendant belittles these symptoms, but it is the distress which must be severe, not the physical manifestations. See comments

j and k to the Restatement section. Mental distress would have to be more than mild and transitory in order to cause these symptoms over a two-year period.

This is a close case, and we have only plaintiff's evidence before us. After a careful study of her evidence we think that plaintiff made out a prima facie case. The jury should have decided, after an opportunity to hear defendant's evidence, whether his conduct was outrageous in the extreme and whether plaintiff suffered severe emotional distress. The trial court erred in granting a nonsuit and the judgment is reversed for a new trial.