Argued and submitted June 5, reversed and remanded September 25,
appellant's petition for rehearing denied October 23,
respondents' petition for rehearing denied October 23, 1979

BREWER,
*Appellant, Cross-Respondent,*
*v.*
ERWIN, et al,
*Respondents, Cross-Appellants.*
(TC A7604 04893; SC 25626)

BREWER,
*Appellant, Cross-Respondent,*
*v.*
ERWIN, et al,
*Respondents,. Cross-Appellants.*
(TC A7709 12910; SC 25626)

(Consolidated Cases)
600 P2d 398

[435]

Michael H. Marcus, Legal Aid Service, Multnomah Bar Assn., Inc., Portland, argued the cause and filed briefs for appellant, cross-respondent.

Margaret H. Leek Leiberan, of Lang, Klein, Wolf, Smith, Griffith & Hallmark, Portland; Charles C. Erwin and W. H. Erwin, of Erwin, Lamb & Erwin, P. C., Portland, argued the cause and filed briefs for respondents, cross-appellants.

Before Denecke, Chief Justice, and Holman,* Tongue, Howell, Lent, and Linde, Justices.

LINDE, J.

_____
*Holman, J., did not participate in the decision of this case.

## LINDE, J.

The present appeal is one phase of a landlord-tenant dispute to which the parties have devoted an extraordinary amount of their time and efforts and those of several courts.[1] The major questions on this appeal involve the tenant's claims for damages under the Residential Landlord and Tenant Act, ORS 91.700 to 91.895, and under tort law. Other issues concern certain rulings on evidence and on attorney fees and the denial of a preliminary injunction.

The initial course of events is undisputed. Plaintiff Suzan Brewer rented the upper of two apartments in a building, formerly a home, owned by defendant Marquam Investment Corporation. Defendants Warde Erwin and Lavelle Mullennex are Marquam's owners and officers. Charles Erwin and Colin Lamb, the other individual defendants, are Warde Erwin's law partners. The building was old and had been allowed to deteriorate. The dispute between the parties began when Marquam decided to demolish the building and sent plaintiff an eviction notice. Upon receiving the notice, plaintiff became interested in a group which sought to prevent the demolition of old houses in the neighborhood and attended one or two of the group's meetings. She did not move out of her apartment. This led to a number of confrontations between the defendants on one side and plaintiff and other persons at the apartment on the other. Plaintiff eventually filed suit, originally asking injunctive relief against allegedly wrongful efforts by defendants to evict her by force, and subsequently adding claims for damages.

After a series of pretrial motions and rulings, the case finally was tried on two causes of action stated in

---

[1] The related cases to which our attention has been directed include *Brewer v. Beers*, 280 Or 251, 570 P2d 650 (1977); *Marquam Investment Corp. v. Brewer*, 40 Or App 175, 594 P2d 1327 (1979) (petition for review denied Sept 5, 1979); *Erwin v. Legal Aid Services*, US Dist Ct, D Or #77-66 (dismissed Jan 20, 1978); *Erwin v. Crampton*, US Dist Ct, D Or #77-117 (dismissed Aug 17, 1977); *Marquam Investment Corp. v. Casciato*, US Dist Ct, D Or #77-370 (dismissed Aug 10, 1977); *Marquam Investment Corp. v. Bonyhadi* (Multnomah County Circuit Court #A7803-03571).

the ninth amended complaint. These sought general and punitive damages against all defendants except Charles Erwin, the first for intentional infliction of emotional distress, and the second for a battery by Warde Erwin while acting in the scope of his authority as president of Marquam Investment Corporation. The trial court granted involuntary nonsuits on both counts in favor of defendants Lamb and Mullennex and directed a verdict in favor of Warde Erwin and the corporation on the first count. On the battery count, the jury returned a verdict against Warde Erwin and Marquam in the amount of $650 general damages and no punitive damages.

## Damages Under the Residential Landlord and Tenant Act.

*The terms of the act.* Under three of plaintiff's assignments of error directed at the trial court's rulings on plaintiff's pleadings, the parties argue whether the Residential Landlord and Tenant Act provides for the recovery of damages for emotional distress and punitive damages for violations of the act.[2] We begin with an examination of the act.

Enacted in 1973, Oregon's statute is patterned on, though not identical with, the Uniform Residential Landlord and Tenant Act. 7A Uniform Laws Annotated 499 (1978). Beginning with provisions of general applicability (ORS 91.700 - 91.735), it deals with the terms of rental agreements (ORS 91.740 - 91.755), imposes obligations on landlords and on tenants (ORS

---

[2] The trial court struck allegations supporting claims for such damages from plaintiff's second complaint, which sought damages for emotional distress caused by violations of the landlord's duty to maintain rental premises in a habitable condition, ORS 91.770, and punitive damages because those violations were "wilful, wanton and malicious." The court struck a claim for twice the amount of actual damages on allegations of the fourth amended complaint that Warde Erwin had damaged the building in retaliation for plaintiff's membership in a "tenant's union or similar organization," ORS 91.865, ORS 91.815. The court also sustained a demurrer to plaintiff's claim, in her sixth amended complaint, for damages for emotional and psychological injuries caused by defendants' intentional interruption of plaintiff's natural gas service and destruction of portions of the building.

91.760 - 91.790), and spells out tenants' and landlords' remedies (ORS 91.800 - 91.865). Several provisions deal expressly with the remedy of damages. While these provisions do not resolve all arguable issues, it is apparent that the drafters of the Residential Landlord and Tenant Act were as concerned with the remedial aspects of disputes between landlords and tenants as with the parties' substantive obligations during the tenancy. Indeed, prescribing rules for the conduct and consequences of disputes in this often difficult relationship is a central purpose of the act.

Provisions for a tenant's recovery of damages from the landlord are found both in the general and in the more specific sections. The general provision states that the remedies provided by the act "shall be so administered that an aggrieved party may recover appropriate damages." ORS 91.725(1). What damages are "appropriate" is sometimes spelled out and sometimes left obscure.

Among the specific provisions, a tenant may recover "actual damages" plus up to three months' rent if the landlord includes forbidden provisions in the rental agreement, ORS 91.745, and twice the amount of a security deposit or prepaid rent wrongfully withheld, ORS 91.760(8). If the landlord fails to comply with the rental agreement or with his statutory obligations to maintain the premises in a habitable condition, the tenant may "recover damages." ORS 91.800(2). The next section, ORS 91.805, allows the tenant to recover "damages based upon the diminution in the fair rental value of the dwelling unit," unless he or she prefers to procure substitute housing at the landlord's cost, if the landlord, contrary to the rental agreement or the statute, deliberately or with gross negligence fails to supply "any essential service." Next, if the landlord "unlawfully removes or excludes the tenant from the premises or wilfully diminishes services" by interrupting "essential services" such as heat, water, or electricity, the tenant may recover twice the periodic rent or twice the ''actual damages''

[439]

sustained, whichever is greater. ORS 91.815. The same measure of damages applies if the landlord retaliates against a tenant who complains to him or to the government or joins a tenants' organization by raising the tenant's rent, decreasing services, or threatening eviction. ORS 91.865. The landlord is also liable for any "loss" resulting from a "deliberate or negligent act" in storing personal property thought to have been abandoned by the tenant, or twice the "actual damages sustained by the tenant" if the landlord's failure to deal properly with the tenant's goods is "deliberate and malicious." ORS 91.840. Similarly, the damages that a landlord may recover for violations of a tenant's obligations are variously stated as "damages," "actual damages," or "not more than two months' periodic rent or twice the actual damages sustained by him, whichever is greater."[3]

As previously mentioned, the specific obligations and remedies of the act are preceded by the general directive of ORS 91.725. It reads, in part:

"(1) The remedies provided by ORS 91.700 to 91.895 shall be so administered that an aggrieved party may recover appropriate damages. The aggrieved party has a duty to mitigate damages."

The text of that section does not offer much affirmative guidance to what measures of damages were prescribed for those breaches of the parties' mutual obligations for which no specific measure is stated, but its history does give an indication of what was not prescribed.

---

[3] The landlord may recover "damages" for any violation of the rental agreement or of the tenant's duties under ORS 91.775 to keep the premises clean and use them in a reasonable manner. ORS 91.820(4). For the tenant's willful failure to give advance notice of an extended absence, or the tenant's refusal to allow the landlord lawful access, the landlord may recover "actual damages." ORS 91.825(1), 91.860(1). And if the tenant holds over without the landlord's consent, and the holdover is willful and not in good faith, the landlord may recover "not more than two months' periodic rent or twice the actual damages sustained by him, whichever is greater." ORS 91.855(3).

■ In the Uniform Act, the section corresponding to ORS 91.725(1), section 1.105(a), is accompanied by this comment:

> "Subsection (a) is intended to negate unduly narrow or technical interpretation of remedial provisions and to make clear that damages must be minimized. The use of the words 'aggrieved party' is intended to indicate that in appropriate circumstances rights and remedies may extend to third persons under this Act or supplementary principles of law (compare Article IV, Parts I and II [the provisions on remedies])."

The comment indicates that the purpose of the section is as much to extend the range of "aggrieved parties" beyond the parties to the rental agreement as it is to prescribe damages between the landlord and tenant. To this extent, the generality of the term "appropriate damages" simply evinces an unwillingness to pursue the collateral question of damages for injured third parties in this statute. They are whatever may be "appropriate" either under the act or under "supplementary principles of law."

■ However, one draft of the Uniform Act proposed this text for section 1.105:

> "(a) The remedies provided by this Act shall be so administered that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this Act or by other rule of law.
>
> "(b) Any right or obligation declared by this Act is enforceable by action unless the provision declaring it specifies a different and limited effect."

URLTA, § 1.105 (3d Draft, April 1972). One version of the bills that led to the Oregon Residential Landlord and Tenant Act similarly proposed to exclude "consequential, special, or punitive damages" in ORS 91.725. 1973 HB 2424, § 5. These proposals were rejected both by the National Conference of Commissioners on Uniform State Laws and by the Oregon legislature. This does not mean that recovery of "consequential,

[441]

special, or punitive damages" was affirmatively approved. It does mean that the "appropriateness" of such damages in litigation under the act was left to be otherwise derived from the act and from other legal sources consistent with it.

■ *Punitive damages.* With respect to plaintiff's claim for punitive damages, we think that allowing such damages under ORS 91.725 for violation of a statutory provision in an action between landlord and tenant would be inconsistent with the attention given to the choice of noncompensatory measures of damages elsewhere in the act. Punitive damages at common law, insofar as they do not merely reflect social solidarity with the outrage of a victim of a deliberate tort apart from its injurious consequences, have been justified as a means of legal deterrence initiated by a private rather than a governmental plaintiff. *See Roshak v. Leathers*, 277 Or 207, 211, 560 P2d 275 (1977). In a commercial or industrial setting, their function is to make it unprofitable to engage in an improper practice when a defendant might otherwise be prepared to bear the risk of having to pay for the resulting harm as an acceptable business cost. *McElwain v. Georgia-Pacific Corp.*, 245 Or 247, 421 P2d 957 (1966); *cf. also* in a non-commercial context, *Fisher v. Carlin*, 219 Or 159, 346 P2d 641 (1959). Legislation often makes use of noncompensatory damages for this purpose and as a device to facilitate private rather than public enforcement of the prescribed standards of conduct. Some statutes simply incorporate a provision for punitive damages. *See, e.g.,* ORS 30.680 (unlawful discrimination in place of public accommodation); ORS 646.638 (part of the Unlawful Trade Practices Act, recently construed in *Crooks v. Pay Less Drug Stores*, 285 Or 481, 592 P2d 196 (1979)); ORS 646.641 (unlawful debt collection practices); *cf.* ORS 659.121(2) ("punitive damages not to exceed $2,500" for certain unlawful employment practices). Others provide for double or treble damages, *see, e.g.,* ORS 105.810 and 105.815 (timber trespass); ORS 756.185 (violations of

public utility laws); ORS 646.780 (antitrust violations), or allow a specified sum in damages regardless of actual loss, *see, e.g.,* ORS 757.606 ($100 for transmitting telegraph message out of order); ORS 746.300 (actual damages or $100, whichever is greater, for violations of automobile body repair provision.) Apart from philosophical or policy reasons that may lead lawmakers to one or another approach, the choice affects such practical aspects of litigation as the negotiability of a settlement and the relevance of defendant's wealth. *See Phelan v. Beswick,* 213 Or 612, 617, 326 P2d 1034 (1958).

As we have noted, the drafters of the Residential Landlord and Tenant Act made use of such devices in a number of provisions. Sometimes they selected the sum of three months' rent beyond actual damages, ORS 91.745, sometimes twice the otherwise relevant amount, ORS 91.760(8), 91.840(4). Sometimes the stated measure of damages is compensatory in a purely financial sense. ORS 91.805.[4] When a statute includes such differentiated provisions for compensatory and for more than compensatory damages for specified violations we find no justification for superimposing upon the statutory scheme an additional remedy of punitive damages, unlimited in amount, for violations of the act. The trial court did not err in striking from plaintiff's second amended complaint the allegations supporting claims for punitive damages for violations of the act.

---

[4] One of the two versions of the act that were before the Legislative Assembly made this proposal for violations of ORS 91.805, the landlord's deliberate or grossly negligent failure to supply heat, water, or "essential services":

"(2) In addition to the remedy provided in paragraph (c) of subsection (1) of this section the tenant may recover punitive damages in an amount not exceeding twice his actual damages, and reasonable attorney fees."

1973 HB 2424 § 29(2). As enacted, ORS 91.805 omits this provision. It retains damages "based upon the diminution in the fair rental value of the dwelling unit" and provides for obtaining substitute housing or essential services at the landlord's expense.

*"Actual" damages.* It is more difficult to discern what the drafters meant when they provided that a tenant, a landlord, or another aggrieved party may recover "damages" or "actual damages" for violations of different sections of the act. The terms are not further explained except for the general directive of ORS 91.725 that they be "appropriate." The use of a modifier in one section and its absence in another section of the same statute ordinarily indicates some intentional difference in meaning. But it is not evident what difference, if any, was intended by the use or absence of "actual" before damages in different sections of the Residential Landlord and Tenant Act. For instance, it might seem that "actual damages" is used in sections where damages appear alongside another statutory measure of recovery, *e.g.*, ORS 91.745(2), 91.815, and "damages" alone where they do not, but the usage is too inconsistent to support this explanation.[5]

The search for the scope of either phrase is further complicated by the fact that the positions of the parties to a residential tenancy are only superficially symmetrical. From the landlord's standpoint a rental is ordinarily a business transaction. Allowing for differences among tenants that may make one preferable to another, their rental payments are fungible. From the tenant's viewpoint, the transaction involves his or her home and personal life. Once the dwelling is occupied, its location, its decor, the view from its windows, the knowledge of one's neighbors, are by no means fungible. It is not surprising that one side to the transaction would consider a monetary, contract law test of

---

[5] *See, e.g.,* ORS 91.840(4). A landlord may recover "damages" for a tenant's failure to comply with the rental agreement or with the obligations to maintain the premises stated in ORS 91.775, *see* ORS 91.820(4), and he may recover "actual damages" for a tenant's failure to give notice of absence, ORS 91.825(1).

Section 4.101 of the Uniform Act proposes that the tenant may recover "actual damages" for noncompliance with the rental agreement or with the statutory standards for habitability. Both SB 159 and HB 2424 dropped the word "actual" from this section, now ORS 91.800(2). We have found no explanation of the significance, if any, attached to this omission.

"actual" damages "appropriate" for a breach while the other would contend for damages to an occupant's personal, noneconomic interest in quiet possession drawn from one or another form of the law of trespass. Yet the act states the damages recoverable by landlords and tenants in identical terms. And it is not invariably true of every residential rental that a defaulting tenant has more than financial concerns in the transaction or that a tenant's breach never imposes emotional or psychological as well as purely financial burdens on a landlord.

Under these circumstances, no one common law measure of damages or "actual" damages would be "appropriate damages" wherever either of these terms appears. We are dealing with damages for violations of statutory obligations. Another reading of this phrase is plausible. The act may be designed to allow recovery of such damages as are appropriate to an injury to the specific interest or interests which compliance with the particular statutory provision is designed to protect. When the provision is one designed to protect a party specifically against financial loss, that loss would be the appropriate measure of damages. The same applies if the purpose is to protect a party against loss of or damage to tangible property, except when the property has special nonmonetary value. For example, the landlord's recovery of "actual damages" for a tenant's willful failure to give notice of absence under a rental agreement, ORS 91.825(1), may well extend to consequential damages resulting from the failure, such as harm to plants or other property, or possible theft or vandalism, or costs incurred in reasonable protective measures, but under any ordinary rental agreement these damages would not extend to emotional or psychological harm from worry about the tenant's unexplained absence. On the other hand, the damages allowed for harassment by a landlord's excessive demands of entry, ORS 91.860(2), do not address an injury to the occupants' merely economic interests. And although we do not now decide

anything not involved in this case, it seems doubtful that the "actual damages" recoverable for a landlord's negligent, deliberate, or malicious loss of a tenant's personal property under ORS 91.840(4) would confine recovery for a lost collection of family photographs, a diary, or similar irreplaceable personal belongings to their market value.

■ In short, when other statutory indications are lacking, the key to damages seems to be to determine what kind of harm, in the setting of a normal residential rental transaction, can reasonably be said to lie within the contemplation of the protective provision of the act upon which the claim is founded. But other indications are not wholly lacking. In some sections the stated measures of damages seem to depart from the hypothesized principle. This in turn complicates application of that principle to violations of other sections. It particularly complicates the relationship between the specified damages recoverable for aggravated breaches of a landlord's obligations and those recoverable for instances of simple noncompliance with a term of the rental agreement or with the standards for habitable premises. These complications become apparent in applying the act to this case.

*Retaliatory acts.* One of plaintiff's claims involves the question whether damages for emotional distress or psychological impairment are included in "actual damages" as used in ORS 91.815. In the complaint to which a demurrer was sustained, plaintiff alleged that certain acts were committed in retaliation for plaintiff's "membership in a tenant's union or similar organization," contrary to ORS 91.865. If the allegations are otherwise sufficient, subsection (2) of that section entitles the tenant to the remedies provided in ORS 91.815, which include the right to recover "an amount not more than two months' periodic rent or twice the actual damages sustained by him, whichever is greater." The trial court sustained the demurrer on defendants' argument that it failed to state a cause of action "for $50,000 as prayed for in the complaint"

[446]

because "twice the actual damages clearly does not mean damages for mental distress, pain and suffering or things like that."

■ As already mentioned, neither the comments to section 4.107 of the Uniform Act, from which this provision was taken, nor the legislative history of the Oregon act states what kind of "actual damages" were meant. However, a clue appears in the comment to § 4.104 of the Uniform Act, which became ORS 91.805. That section deals with a landlord's deliberate or grossly negligent (but not retaliatory) failure to supply "any essential service," and it allows the tenant to recover either the costs of procuring the services or of substitute housing or "damages based upon the diminution in the fair rental value of the dwelling unit." That remedy clearly states an economic measure of the tenant's loss of the value of his bargain with the landlord. The commissioners' comments explain that the remedies allowed for wrongful exclusion, willful interruption of essential services or retaliatory acts forbidden by §§ 4.107 and 5.101 (ORS 91.815 and 91.865), including "twice the actual damages," are additional to the recovery of the economic damages just stated and other remedies provided in earlier sections. This explanation implies that the "actual damages" allowed for retaliatory or otherwise unlawful or willful acts were meant to include something more than the narrow economic measure of the tenant's loss defined in ORS 91.805, a loss which that section lets a tenant recover without any aggravating circumstances.[6] When we add the fact that the act

---

[6] The comment to § 4.104 itself raises doubts in the course of allaying others. It reads:

"The remedies under Sections 4.107 and 5.101(b) are applicable where the landlord affirmatively acts to interrupt or diminish services, etc., and those remedies are in addition to the remedies provided in Sections 4.101, 4.103 and 4.104."

7A Uniform Laws Annotated 543 (1978). But the remedies provided in § 4.101 and, by reference, in 4.103 include the recovery of "actual damages." Since §§ 4.107 and 5.101 in the commissioners' draft would allow threefold

sometimes specifies the remedy of "actual damages" in provisions plainly designed to protect noneconomic interests, where a merely economic measure could not be "appropriate," we conclude that for breach of a provision that encompasses such interests, actual harm to a protected interest was not meant to be excluded from the measure of damages.

■ This is not equivalent to an openended measure of general damages for "pain and suffering" drawn from tort law. We understand "actual damages" or "damages" to refer to compensation for tangible harm resulting from the statutory violation, though it need not be economic harm. The harm must be of a kind within the contemplation of the protective provision that was breached.[7] It does not extend to the sort of annoyance, anger, or sense of frustration that frequently accompanies a dispute over a business transaction even when these common reactions are described as "emotional distress." Although we have described the tenant's stake in a residential rental as more than an economic interest, nevertheless the tenant ordinarily has no reason to expect the rental to be other than an arm's-length business transaction from the landlord's standpoint, with the concomitant risk of disagreement and dispute over mutually opposing interests. This court has held that worry and anxiety over a contractual dispute as such does not support a claim for damages for emotional distress even when defendant was guilty of a clear breach of

---

actual damages for aggravated violations, the comment literally suggests that this remedy of treble damages might in some cases be additional to the remedy of actual damages, a total of four times actual damages.

The comment thus invites the question whether the commissioners would use such a multiplication of "actual damages" if they meant "actual damages" to include a jury's evaluation of a tenant's emotional distress. On the other hand, the comment may have been written with a view to the tenant's remedies other than damages, overlooking the potential multiplication of "actual damages" under several sections.

[7] Also, ORS 91.725 imposes a duty on the aggrieved party to mitigate damages.

contract. *Farris v. U.S. Fid. and Guar. Co.*, 284 Or 453, 587 P2d 1015 (1978).

■ ■ On the other hand, such necessary recognition and acceptance of the risk of controversy need not preclude recovery of damages when tangible consequences such as physical illness, medical bills, inability to sleep, to eat or work in one's dwelling, separation of family members or similar disruptions of one's personal life result from the events or conditions that breach the standards of secure occupancy and essential services guaranteed by the act, rather than from the strain of preoccupation and vexation with the dispute itself. If physical hardship and impairment can give rise to a claim for "actual damages" under the act, we see nothing to exclude such actual impairment because it is "psychological" or 'emotional" rather than physical. Accordingly, it was error to sustain a demurrer to the sixth amended complaint on the ground that such psychic injuries cannot give rise to a claim for damages under the act.[8]

The question remains whether the allegations of the complaint were otherwise adequate to invoke ORS 91.865. The relevant terms of this section state:

"(1) Except as provided in this section, a landlord may not retaliate by increasing rent or decreasing services or by bringing or threatening to bring an action for possession after:
\* \* \* \*
"(c) The tenant has organized or become a member of a tenants' union or similar organization."

Plaintiff did not allege an increase in rent or a threat to bring an action for possession. The question is whether she adequately alleged a decrease in services. We hold that she did.

---

[8] A different question is whether a general allegation of "psychological impairment" (or, by analogy, of "physical impairment") adequately pleads the exact nature of the injury asserted or should be made more definite, but that was not and should not have been the basis for sustaining the demurrer.

The act does not define the word "services," but ORS 91.815 lists, as examples of "essential services," heat, running water, hot water, and electricity. The implication is that there are other services which a landlord may provide, not included in this list, which are not "essential." ORS 91.865(1) prohibits a retaliatory decrease in *any* services.

■ The landlord has a statutory duty to maintain the dwelling unit in a habitable condition. ORS 91.770(1) provides that a dwelling unit is uninhabitable if it substantially lacks such things as weather protection, plumbing facilities, approved water supply and sewage connection, heating and lighting facilities that comply with applicable law, clean and sanitary surroundings, maintenance of structural and service elements of the building in good repair and safety from fire hazards.[9] Some of these are "essential services"

---

[9] ORS 91.770(1) reads:

"A landlord shall at all times during the tenancy maintain the dwelling unit in a habitable condition. For purposes of this section, a dwelling unit shall be considered unhabitable if it substantially lacks:

"(a) Effective waterproofing and weather protection of roof and exterior walls, including windows and doors;

"(b) Plumbing facilities which conform to applicable law in effect at the time of installation, and maintained in good working order;

"(c) A water supply approved under applicable law, which is:

"(A) Under the control of the tenant or landlord and is capable of producing hot and cold running water;

"(B) Furnished to appropriate fixtures; and

"(C) Connected to a sewage disposal system approved under applicable law and maintained in good working order to the extent that the system can be controlled by the landlord;

"(d) Adequate heating facilities which conform to applicable law at the time of installation and maintained in good working order;

"(e) Electrial lighting with wiring and electrical equipment which conform to applicable law at the time of installation and maintained in good working order;

"(f) Building, grounds and appurtenances at the time of the commencement of the rental agreement in every part clean, sanitary and free from all accumulations of debris, filth, rubbish, garbage, rodents and vermin, and all areas under control of the landlord kept in

under ORS 91.815, others are not. But the prohibition of ORS 91.865 against retaliatory decrease in services includes a decrease in any of the standards and services required by ORS 91.770 when it is attributable to a retaliatory motive.

■ Plaintiff's sixth amended complaint, to which a demurrer was sustained, charged defendants Mullennex and Lamb with a retaliatory interruption of her natural gas service. As to Warde Erwin, the complaint alleged that in retaliation for her membership in a tenants' organization he entered the downstairs of the building occupied by plaintiff where he

> "smashed windows and walls, pried the back porch off the house, and destroyed the fence * * * [leaving] * * * a large pile of debris consisting of broken wood, broken glass, and rusty nails scattered over the backyard of Plaintiff's premises."

Even taking into account the fact that plaintiff lived not in but above the unit in which the interior destruction took place (a fact which was not pleaded but which was undisputed at trial), the allegations that the back porch was pried off the house and that a large pile of debris was left scattered in plaintiff's back yard adequately allege a decrease in services in the form of impairment of habitability. The complaint therefore adequately alleged retaliatory actions by the

every part clean, sanitary and free from all accumulations of debris, filth, rubbish, garbage, rodents and vermin;

"(g) An adequate number of appropriate receptacles for garbage and rubbish in clean condition and good repair at the time of the commencement of the lease or rental agreement, and the landlord shall provide and maintain appropriate serviceable receptacles thereafter and arrange for their removal unless the parties by written agreement provide otherwise;

"(h) Floors, walls, ceilings, stairways and railings maintained in good repair;

"(i) Ventilating, air conditioning and other facilities and appliances, including elevators, maintained in good repair if supplied or required to be supplied by the landlord; or

"(j) Safety from the hazards of fire."

[451]

defendants within the meaning of ORS 91.865, and the demurrer should not have been sustained.[10]

*Damages under ORS 91.770.* A difficult problem is presented whether the act means to allow a tenant to recover damages for emotional distress due to a landlord's failure to maintain the statutory standards of habitability when the failure is not retaliatory, nor willful, ORS 91.815, nor deliberate or grossly negligent, ORS 91.805. As stated above, it might seem that the "damages" recoverable under ORS 91.800(2) for such ordinary noncompliance would be compensation for such harm as might be contemplated to follow from the breach of the particular protective standard involved, when there are no other statutory indications to the contrary. But the statutory pattern does imply limits on such damages for nonculpable breaches.

ORS 91.770(1), set out in note 9, above, declares that a rental dwelling that lacks any of the elements of structure and services there specified "shall be considered unhabitable." Some of the listed requirements clearly encompass protection of the occupants' health, for instance those dealing with water supply, sanitation, heat and ventilation, and of their physical safety, for instance the standards for electric wiring, stairways and railings, and avoidance of fire hazards. They are not concerned merely with assuring that the tenant receives what he pays for, nor with intangible comfort and enjoyment. When a tenant or other "aggrieved party" in fact suffers an injury within the contemplation of these protective provisions, it would be incongruous to translate that injury only into a reduced rental value of the dwelling. "Appropriate

---

[10] We do not reach plaintiff's claim that it was error to strike her claim for double actual damages in paragraph XVII of her fourth amended complaint. The record does not show that this paragraph was not stricken merely as pleading a conclusion of law nor that plaintiff did anything more to pursue the remainder of that complaint.

Because defendants have not raised the issue, we do not decide whether a plaintiff, before recovering damages as provided in ORS 91.815, must have terminated the rental agreement or "recovered possession." Plaintiff had not been ousted.

damages" under ORS 91.725 certainly includes compensation for the loss of life or health and the accompanying costs, not only for the economic value of any goods that may have been damaged or for the reduced rental value. However, we think that the extension of damages to cover emotional distress due to the uninhabitable condition is inconsistent with adjoining provisions of the statute.

■ ■ORS 91.805 allows a tenant "damages based upon the diminution of the fair rental value of the dwelling unit," when a landlord "deliberately refuses or is grossly negligent in failing to supply any essential service," (subsection (1)), but apparently not when the landlord is merely negligent (subsection (3)).[11] Perhaps these provisions address only the remedy of damages when a tenant has suffered no other injury and are independent of those under ORS 91.800(2). Even so, they indicate that the legislature differentiated the gravity of a landlord's breaches in two respects: one, between failure to supply "essential services" and other required services, and the other, between a nonculpable or negligent failure and a willful, grossly negligent, or retaliatory one. We think it is "appropriate" to this differentiation that a tenant, while entitled to other remedies, cannot charge to the landlord the tenant's emotional or psychological distress over nonculpable shortcomings of rented quarters, but that the tenant can recover for actual psychological harm suffered from the landlord's deliberate, willful, retaliatory, or malicious acts as proscribed by ORS 91.815, 91.865, or 91.840(4), within the limits stated earlier in this opinion. Accordingly, the trial court did not err in striking plaintiff's claim of damages for emotional distress for nonculpable breaches of ORS 91.770(1).

---

[11] We deal only with the statute, not with whatever tort claims a plaintiff may have independent of the tenancy relationship. We also express no view on the effect of notice or lack of notice to the landlord of the alleged noncompliance with the requirements of the statute or the rental agreement, a matter not briefed by the parties.

In the foregoing we have sought to accommodate the competing policies and values that the drafters of the act apparently meant to serve in the act, including its remedial provisions. The measure of damages for breach of an obligation often represents a policy decision as crucial for the parties concerned as the definition of the obligation itself. Yet often the measure of damages gets little or no legislative attention. The Residential Landlord and Tenant Act does give attention to specific measures of damages recoverable for some violations but intermixes these with references to "damages," to "actual damages," and to multiple "actual damages," all subject to a general directive that they be "appropriate." We have found no explanation of these provisions in the published comments of the Commissioners on Uniform State Laws on the uniform act, or in the legislative history of the Oregon act, or in the published analyses of either of these. In *L & M Investment Co. v. Morrison*, 286 Or 397, 594 P2d 1238 (1979) we noted similar difficulties in reconciling other provisions of the act. If the interpretation we have given the act departs from the intended policy, or if that policy is revised in the light of experience, its provisions can be amended accordingly.

### Plaintiff's Tort Claim

Plaintiff pleaded a cause of action for damages for the tort of intentional infliction of emotional distress. She assigns as errors the trial court's rulings in granting motions for involuntary nonsuit in favor of defendants Mullennex and Lamb and for directed verdicts in favor of Marquam Investment Corporation and Warde Erwin. In reviewing rulings of this kind, the question on appeal is not what was found to have occurred but what a jury, viewing the evidence and all inferences in the light most favorable to plaintiff, might have found if the case had been submitted to it.

The exact elements of the tort which plaintiff pleaded are still in process of clarification, *see* Prosser, Law of Torts 50, 52, 56 (4th ed 1971), and there have

been relatively few occasions in this jurisdiction to consider those elements. *Pakos v. Clark*, 253 Or 113, 453 P2d 682 (1969), assumed the plaintiff's premise that the characteristics of the tort were those described in 1 Restatement of Torts (Second) § 46 (1965) while deciding that plaintiff had not made out a case under that description. Thereafter, *Rockhill v. Pollard*, 259 Or 54, 485 P2d 28 (1971), proceeded on the premise that *Pakos v. Clark* had "recognized" the tort as defined in the Restatement, although strictly speaking the court can hardly be said to have brought the Restatement formulation full-blown into Oregon law in the course of rejecting a plaintiff's effort to invoke it.[12] *Rockhill v. Pollard* itself held that a jury might hold a physician liable in tort if it found from the evidence that persons injured in a highway accident, including a 10-month old child, had been taken to his office on a December evening, that he made only a cursory examination of the unconscious child and declined to examine the visibly injured adults or to advise them where to get help, and that he would not

[12] Although this court frequently quotes sections of the Restatements of the American Law Institute, it does not literally "adopt" them in the manner of a legislature enacting, for instance, a draft prepared by the Commissioners on Uniform State Laws, such as the Residential Landlord and Tenant Act. In the nature of common law, such quotations in opinions are no more than shorthand expressions of the court's view that the analysis summarized in the Restatement corresponds to Oregon law applicable to the facts of the case before the court. They do not enact the exact phrasing of the Restatement rule, complete with comments, illustrations, and caveats. Such quotations should not be relied on in briefs as if they committed this court or lower courts to track every detail of the Restatement analysis in other cases. The Restatements themselves purport to be just that, "restatements" of law found in other sources, although at times they candidly report that the law is in flux and offer a formula preferred on policy grounds.

Restatement of Torts § 46 exemplifies this ambiguity of the Restatement role between systematic statement of existing law and source of doctrinal innovation. *See* Note, *Intentional Infliction of Emotional Distress: A New Tort for Maryland -- Harris v. Jones*, 38 Md L Rev 366, 373-375 (1979), reviewing the bold sally from the first Restatement of Torts (1934) to its 1948 Supplement and the cautious reconsideration in the Restatement (Second), tentative draft of 1957 and the current version as adopted in 1963. A more famous example is Restatement of Torts (Second) § 402A, concerning liability for injuries caused by defective products, now enacted as a statute complete with incorporation by reference of Comments a - m. Or L 1979, ch 866, § 2.

let plaintiffs remain in his office until someone could come for them but made them wait on the street in freezing weather. The court described it as a "close case" but held that the doctor's conduct might be found tortious because of the "important factor [of] the particular relationship between the parties. * * * Defendant was under a professional obligation to plaintiff-- they were not dealing at arm's length." 259 Or at 60. The opinion continued:

> "The object of a cause of action as described in [Restatement] § 46 is to compensate for real suffering intentionally or recklessly caused by socially intolerable behavior which invades plaintiff's interest in peace of mind. Certainly a physician who is consulted in an emergency has a duty to respect that interest, at least to the extent of making a good-faith attempt to provide adequate treatment or advice. We think a jury could infer from the evidence that defendant wilfully or recklessly failed to perform that duty."

259 Or at 63.[13]

The most recent precedent, *Turman v. Central Billing Bureau*, 279 Or 443, 568 P2d 1382 (1977), presented a significantly different version of the tort. It affirmed a verdict for plaintiff against a debt collection agency which had used abusive and threatening telephone calls to bully plaintiff into paying a medical bill, persisting even after being told that plaintiff had arranged for instalment payments directly with the clinic concerned. The premise of *Turman* differs from that of *Rockhill* because in *Turman* the very purpose of defendant's conduct was to inflict psychological and emotional distress on plaintiff. Defendant's agents did so intentionally, not from any sudden ill temper or dislike of plaintiff, whom they apparently did not know, but as a device

---

[13] The court in *Rockhill v. Pollard* also expressed dissatisfaction with the battery of epithets used in the Restatement comments to characterize the tort -- *e.g* "outrageous," "extreme," "beyond all possible bounds of decency," "atrocious," "utterly intolerable." It thought it best "for this case" to require simply that a defendant's conduct which inflicts severe emotional distress must be "outrageous in the extreme," but that "the test for liability in these cases can only be worked out on a case to case basis." 259 Or at 60.

for their own objectives. This places *Turman* within a well recognized line of cases involving personally abusive business tactics by insurance adjusters, collection agencies, or other creditors, mostly against inexperienced and vulnerable individuals.[14] Such an intent was not charged against the physician in the earlier case, whose conduct the court, in the quotation from *Rockhill v. Pollard,* above, thought a jury might find "wilfully or recklessly" in default of his professional duty to plaintiffs.

■ The cause of action recognized in *Turman* is an intentional tort. Its essence is that the infliction of actual mental suffering on the plaintiff is the deliberate purpose of defendant's conduct, although that conduct may of course have an ulterior objective, as in *Turman.* Such a purpose is itself wrongful in the absence of some privilege or justification. The additional requirement that defendant's means of inflicting the injury must have been extraordinary is explained as necessary, first, to distinguish actionable conduct from the insults, ill temper, and offensive jokes that persons are expected to endure under contemporary standards of behavior, *see Pakos v. Clark, supra,* and second, to provide a setting of objective reality for a claim of harm that otherwise rests only on evidence of the plaintiff's subjective reaction divorced from physiological or other tangible injury. *See* Prosser, *supra,* at 50, 56. When the wrongful purpose is lacking, on the other hand, the tortious element can be found in the breach of some obligation, statutory or otherwise, that attaches to defendant's relationship toward plaintiff, as in *Rockhill v. Pollard, supra,* and as has long been imposed on innkeepers, public carriers, and the like.[15] This court has not had

---

[14] *See* Prosser, *supra,* at 57; Harper & James, *The Law of Torts* 667 (1956); Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv L Rev 1033, 1063-1064 (1939); Annot., 87 ALR3d 201 (1978).

[15] *See Harper & James, supra,* at 667, 670-673; Prosser, *supra,* at 52-53; Magruder, *supra,* at 1050-1053. Thus in *Pakos v. Clark, supra,* in which plaintiff was insulted and ridiculed by deputy sheriffs, the court

occasion to consider whether in the absence of such a relationship a recovery for solely emotional distress can be based on a defendant's conduct, not otherwise tortious, that a jury may find to be beyond the limits of social toleration, though the conduct is not deliberately aimed at causing such distress but only reckless of the predictable effect. *Cf. Douglas v. Humble Oil*, 251 Or 310, 317, 445 P2d 590 (1968); *compare Melton v. Allen*, 282 Or 731, 736, 580 P2d 1019 (1978).

■ Nor do we need to consider it in this case. Our review of the record persuades us that there was sufficient evidence to go to the jury on the theory that defendants engaged in abusive conduct that was deliberately designed to frighten or otherwise distress plaintiff into abandoning the premises and that went beyond the outer limits of what a reasonable person in plaintiff's position should be expected to tolerate in an arm's-length dispute. If so, the case falls squarely within the theory of *Turman v. Central Billing Bureau, supra.*[16] We shall not further lengthen this opinion by reciting the evidence in detail. In summary, two days after the date Marquam's notice had told plaintiff to leave the premises, utility company employees arrived at the building and dug a hole in the yard to disconnect the natural gas service. There was testimony that defendant Mullennex told the workers to pay no attention to statements by plaintiff and others that the house was occupied and that "we'll just break down the door" in order to remove stoves

___

pointed out that plaintiff came to the sheriff's office and was not detained but rather encouraged to leave, but that he insisted on pursuing his errand over a period of three hours. 253 Or at 129. The relationship might well have been different if he had been detained and compelled to endure personal abuse.

[16] Courts in California and New York have applied the intentional tort theory to the landlord-tenant relationship, *Newby v. Alto Riviera Apartments*, 60 Cal App 3d 288, 131 Cal Rptr 547 (1976); *Richardson v. Pridmore*, 97 Cal App 2d 124, 217 P2d 113 (1950); *Emden v. Vitz*, 88 Cal App 2d 313, 198 P2d 696 (1948); *Scheman v. Schlein*, 35 Misc2d 581, 231 NYS2d 548 (1962). An early Texas case, antedating Restatement § 46, contributed to the development of the theory in this area. *Duncan v. Donnell*, 12 SW2d 811 (Tex Civ App 1928).

and heaters from the apartments, that defendant Lamb in fact kicked in the door to one apartment although keys were available, and that he threatened force against one of plaintiff's friends who remonstrated with him. Later in the day Lamb returned with Warde and Charles Erwin and padlocked the door that was kicked open. When plaintiff asked them what they were doing, they refused to reply to her, but they made abusive and threatening statements to one of her friends who was present.

Again there is testimony that later on the same day, while plaintiff was talking with friends in front of the house, Warde Erwin drove up, swerving as though he intended to hit one of plaintiff's friends, and that he told the group that they had no "damn business" there and that if they did not leave his property he "would do something . . . I don't know what I'll do but I'll do something." The following day he and Lamb returned and entered the basement. They refused to talk with plaintiff, and when she tried to follow them Warde Erwin hit or pushed her in the face. There was further testimony that during the ensuing months Warde Erwin, and sometimes Lamb and Mullennex, would behave in an alarming manner while driving past or parking near the house, including late at night.

Other evidence was excluded over plaintiff's objection. Plaintiff made an offer of proof that while she was away on vacation and a friend occupied the apartment, Warde Erwin partially demolished the downstairs apartment, breaking windows and interior walls, removing some siding and the back steps, tearing down parts of the fence, and leaving the yard littered with wood, glass, and other debris. Contrary to defendants' argument, this evidence was not offered to show plaintiff's distress at harm caused or threatened to someone other than herself; rather, she claims that it is further evidence that defendants intentionally upset her by partially demolishing the building under

[459]

her apartment. She offered to testify that as a result of the partial demolition her heating bill rose, the floors of the apartment felt weakened, and intruders entered the downstairs apartment, causing her to fear for her safety.

In response, Mr. Erwin testified that his purpose was to proceed toward the eventual demolition of the building, having notified plaintiff to vacate the apartment, and that he partially dismantled the downstairs apartment in order to make it uninhabitable so that no one would simply move in, and in order to study the construction of the building. As we have said, the issue here is not whether the course of events and the inferences of defendants' motives were as plaintiff claims. The jury might well believe defendants' version of these facts. It might conclude that plaintiff and her witnesses perceived as persecution what was only the rudeness of a frustrated property owner faced with a stubborn occupant and provoked even to the point of the battery for which the jury awarded plaintiff damages. But the jury might also believe, to the contrary, that the individual defendants' course of conduct was designed deliberately to cause plaintiff such distress that she would abandon the apartment without putting up prolonged resistance through drawn-out legal proceedings, and also that they acted on behalf of the owner, Marquam Investment Corporation. We hold only that plaintiff was entitled to have the evidence submitted to the jury.[17]

---

[17] Plaintiff also assigns as error certain other rulings on evidence. The court ruled that plaintiff's treating psychologist, who had administered a certain psychological test to her but testified that he did not rely on its results, was required over plaintiff's objection to put in evidence both the test answers and the evaluation thereof by another psychologist who was not called as a witness. We agree that this evaluation was an out-of-court statement of an expert not available for cross-examination and thus inadmissible hearsay. *Wilson v. Piper Aircraft Corporation*, 282 Or 61, 75-76, 577 P2d 1322 (1978), *Streight v. Conroy*, 279 Or 289, 294-295, 566 P2d 1198 (1977). We need not pursue the other rulings, because in the event of another trial the evidence may be different, or differently presented, or the trial judge may make other rulings on matters that are largely within his discretion.

## Denial of an Injunction

Finally, we consider plaintiff's contention that the trial court erred in refusing to enjoin Marquam Investment Corporation from prosecuting an action for possession in district court. The district court action was filed in October of 1976, about six months after plaintiff filed the present case but before it was at issue. Upon receiving a summons in the district court action, plaintiff sought the injunction which the trial court in this case denied.

We see no present purpose to be served by deciding whether the trial court's refusal to grant the injunction was error. Plaintiff's reason for seeking the injunction was apparently to have the district court's decision on the right to possession await the outcome of the present case because some of her affirmative claims at issue in this case would also constitute defenses to an action for possession if that action was found to be retaliatory. ORS 91.865(2). The trial in the present case did not resolve the merits of those issues because of the rulings we have reviewed above. Meanwhile, however, the action for possession in the district court did proceed, and plaintiff's brief states that she has now surrendered possession of her apartment to Marquam Investment Corporation.

*Pacific N. W. Dev. Corp. v. Holloway*, 274 Or 367, 546 P2d 1063 (1976), on which plaintiff relies, held that a tenant's surrender of possession did not moot an appeal, when the question of the right to possession determined who was properly entitled to final judgment and, therefore, who was entitled to statutory attorney fees under ORS 91.755. That decision may support a plaintiff's right to prosecute an appeal in an action for possession after surrendering possession of the premises, but it is not in point here.

Plaintiff also argues that the right to possession and her claims for affirmative relief should have been adjudicated together in the district court. Again, that argument is appropriate in an appeal from the district

court proceeding but is not relevant to the issues in this case.

█ It appears, therefore, that plaintiff has not been prejudiced by the trial court's refusal to allow the *injunction in any respect for which we could now provide meaningful relief*. Plaintiff has surrendered possession of the premises and has not asked to be restored to possession. As to attorney fees, plaintiff has informed us that the crucial issue which would have remained for litigation in the district court even after a favorable decision in this case -- whether the action for possession was retaliatory -- has been decided by that court adversely to plaintiff. That determination is now final. *Marquam Investment Corp. v. Brewer*, 40 Or App 175, 594 P2d 1327 (1979) (petition for review denied Sept 5, 1979). We do not, therefore, reach the merits of this assignment of error.

### Defendants' Claims of Attorney Fees

Defendants have also appealed, contending that they were entitled to attorney fees under provisions of the Residential Landlord and Tenant Act and of a federal statute governing litigation financed by the Legal Services Corporation.[18] In view of our disposition of plaintiff's appeal, these contentions require little discussion.

---

[18] ORS 91.755:

"In any action on a rental agreement or arising under ORS 91.700 to 91.895, reasonable attorney fees may be awarded to the prevailing party together with costs and necessary disbursements, notwithstanding any agreement to the contrary. As used in this section, 'prevailing party' means the party in whose favor final judgment is rendered."

42 USC § 2996e(f) (Supp I 1976):

"If an action is commenced by the [Legal Services] Corporation or by a recipient [in this case the Multnomah County Legal Aid Service] and a final order is entered in favor of the defendant and against the Corporation or a recipient's plaintiff, the court shall, upon motion by the defendant and upon a finding by the court that the action was commenced or pursued for the sole purpose of harassment of the defendant or that the Corporation or a recipient's plaintiff maliciously abused legal process, enter an order (which shall be appealable before being made final) awarding reasonable costs and legal fees incurred by the defendant in defense of the action, except when in contravention of a State law, a rule of court, or a statute of general applicability. Any such costs and fees shall be directly paid by the Corporation."

The trial court refused to allow attorney fees under the Oregon statute, apparently on the ground that the issues actually tried did not arise under the Residential Landlord and Tenant Act. We need not decide whether or not that ruling was correct because we are remanding the case for trial of issues clearly within the statute's coverage. The ultimate resolution of those issues will determine who is the prevailing party for purposes of the statute.[19] As to the claim for attorney fees at trial under the federal statute, the trial court has found, contrary to defendants' contention, that the action was not commenced or pursued for the sole purpose of harassment.

What remains is Charles Erwin's federal claim for attorney fees on appeal. Because plaintiff's notice of appeal declared her intention to contest the order sustaining Charles Erwin's demurrer and plaintiff then abandoned any criticism of that order, Erwin asks us to find that as to him plaintiff's appeal was pursued "for the sole purpose of harassment of the defendant," entitling him to attorney fees under 42 USC § 2996e(f).

The statute says nothing about attorney fees on appeal, and we have found no federal appellate decision indicating whether they are available. Possibly the parenthetical provision that attorney fees under the statute "shall be appealable before being made final" implies something to the contrary. We need not decide this, because in any event we are not prepared to hold that plaintiff's notice of appeal, followed by abandoning what must have seemed an untenable position, is by itself sufficient evidence of the kind of intent to harass contemplated by the statute. Considering the relatively short time allowed for filing an

---

[19] Defendant Charles Erwin's claim stands on a somewhat different footing because the trial court sustained his demurrer to plaintiff's causes of action, and plaintiff has not contested that ruling on appeal. He is not, however, entitled to recover attorney fees from plaintiff under ORS 91.755 because, although he had opportunity to do so, he never pleaded his right to recover them. *Pritchett v. Fry*, 286 Or 189, 593 P2d 1133 (1979).

appeal, a cautious attorney may sometimes attempt to protect a client's position by listing in the notice trial court rulings that he later determines to have been proper, without, absent other evidence, being liable to a charge of harassment.

In summary, we conclude that plaintiff adequately alleged certain claims for damages under the Residential Landlord and Tenant Act and that the evidence was sufficient to have her tort claim submitted to the jury. She is therefore entitled to have the case returned to the trial court for further proceedings in accordance with this opinion.

Reversed and remanded.