Argued and submitted May 1, 2007, on National Union Fire Insurance Company of Pittsburgh Pennsylvania and Port of Portland's appeal, reversed and remanded for entry of judgment in favor of appellants; on Scottsdale Insurance Company's and Nautilus Insurance Company's appeals, affirmed June 18, both Scottsdale Ins. Co.'s petition for review and Starplex Corp.'s petition for review denied October 3, 2008 (345 Or 317)

# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PENNSYLVANIA
## and Port of Portland,
### *Plaintiffs-Appellants,*

*v.*

## STARPLEX CORPORATION,
### an Oregon Corporation,
### *Defendant-Respondent,*

### *and*

## SCOTTSDALE INSURANCE COMPANY
### and Nautilus Insurance Company,
### *Defendants.*

## STARPLEX CORPORATION,
### an Oregon Corporation,
### *Cross-Claim Plaintiff,*

*v.*

## SCOTTSDALE INSURANCE COMPANY
### and Nautilus Insurance Company,
### *Cross-Claim Defendants.*

# NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PENNSYLVANIA
## and Port of Portland,
### *Plaintiffs,*

*v.*

## STARPLEX CORPORATION,
### an Oregon Corporation,
### *Defendant-Respondent,*

### *and*

## SCOTTSDALE INSURANCE COMPANY
### and Nautilus Insurance Company,
### *Defendants-Appellants.*

Multnomah County Circuit Court
030505535; A128666

188 P3d 332

562-b

Pamela J. Stendahl argued the cause for appellants National Union Fire Insurance Company of Pittsburgh Pennsylvania and Port of Portland. On the briefs were Peter R. Chamberlain, Richard A. Lee, Vicki M. Smith, and Bodyfelt Mount Stroup & Chamberlain, LLP.

Michael A. Lehner argued the cause for appellant Scottsdale Insurance Company. With him on the briefs was Lehner & Rodrigues PC.

James M. Callahan argued the cause for appellant Nautilus Insurance Company. With him on the briefs was Callahan & Shears, P.C.

Lainie Block argued the cause for respondent. With her on the brief were Julie R. Vacura and Larkins Vacura, LLP.

Before Schuman, Presiding Judge, and Ortega, Judge, and Carson, Senior Judge.

ORTEGA, J.

**ORTEGA, J.**

Starplex Corporation entered into a contract with the Port of Portland to provide ground transportation services at Portland International Airport (PDX). The contract provided in part that Starplex would hold the Port harmless as to all claims resulting from Starplex's acts or services arising from its performance of the contract. Two independent shuttle van drivers (the Pierre plaintiffs) brought an action (the underlying action) against both the Port and Starplex under 42 USC sections 1981, 1983, and 2000d; for negligence; and for intentional interference with business relations. Following a jury trial and entry of judgment in favor of the Pierre plaintiffs against the Port under section 1983 and against Starplex on the claims for intentional interference with business relations, the parties settled the underlying action.

The Port and its liability insurer, National Union Fire Insurance Company (National) (collectively, the Port), then brought this action against Starplex and its liability insurers, Nautilus Insurance Company (Nautilus) and Scottsdale Insurance Company (Scottsdale), seeking to recover its costs of defending and settling the Pierre plaintiffs' claims. Starplex cross-claimed against Nautilus and Scottsdale for breach of contractual duties to defend and indemnify.

The Port settled its claims against Nautilus and Scottsdale. The trial court granted Starplex's motion for summary judgment against Nautilus and Scottsdale as to Starplex's claim for breach of the duty to defend and granted Scottsdale's and Nautilus's motions for summary judgment as to Starplex's claim for indemnity. The Port's claims against Starplex then were tried to the court, which entered judgment in Starplex's favor on all claims.

The Port now appeals the judgment against it in Starplex's favor. Nautilus and Scottsdale likewise appeal the judgment in Starplex's favor on their duty to defend Starplex. We reverse the judgment as to Starplex's duty to defend and indemnify the Port and remand for entry of judgment in favor

of the Port. We affirm the judgment in favor of Starplex as to the duty of Nautilus and Scottsdale to defend Starplex.

The material facts are not in dispute. The underlying action involved the conduct of Starplex employees colloquially known as "starters" (called "transportation assistants" in the contract between the Port and Starplex). The contract between the Port and Starplex included the following provisions relating to starters' job functions and duties:

"A.  Scope of Work

"1.  [Starters] are to ensure that passengers who need commercial ground transportation at [PDX] are given accurate transportation information options on all modes available. [They] must be able to provide this information in a courteous and professional manner. Excellent customer service is the highest priority of this position.

"2.  [Starters] are required to monitor ground transportation operations by providers. [They] must fully understand the Commercial Roadway rules and regulations as well as requirements for all providers and employees. If infractions of the ground transportation rules and regulations are observed, [starters] will be required to accurately record the infraction and occasionally take limited action with the provider. [They] must be able to accurately testify at administrative hearings on violations.

"3.  [Starters] are required to accurately record all customer and provider complaints on forms provided by the Port * * *.

"4.  [Starters] may experience conflict from time-to-time between providers, customers, and [starters]. The [starter] is expected to minimize conflicts and avoid provoking any confrontations with commercial roadway drivers and customers."

The contract also contained an indemnity clause, which provided:

"Indemnity:  [Starplex] acknowledges responsibility for liability arising out of the performance of this contract and shall hold [the] Port harmless from and indemnify [the] Port for any and all liability, settlements, loss, costs, and

expenses in connection with any action, suit, or claim resulting or allegedly resulting from [Starplex's] acts, omissions, activities, or services in the course of performing this contract."

(Underscoring in original.)

██ Several years into the contract, the Pierre plaintiffs initiated their action against the Port and Starplex, ultimately filing an original and three amended complaints. Because duties to defend in that litigation potentially arose from the allegations of any of those complaints, we describe each in turn.[1]

In their original complaint (filed in June 1999), the Pierre plaintiffs named the Port, but not Starplex, as the sole defendant. They generally alleged that the Port was an independent public agency that operated PDX and regulated commercial ground transportation services there, including shuttle vans; that the Port controlled the van operators through rules that were enforced by employees known as "starters"; and that the starters engaged in acts of illegal discrimination against the Pierre plaintiffs, who are black, including referring to the Pierre plaintiffs in racially offensive terms and enforcing rules of conduct against, threatening violence against, and referring customers to the Pierre plaintiffs based on race and national origin, as well as seeking to exclude them from working at the airport. The Pierre plaintiffs also generally alleged that they complained on numerous occasions about illegal conduct and that the Port failed to investigate or determine the merits of the complaints or take corrective or preventive measures in relation to the alleged discriminatory conduct. In their first, second, and third claims for relief, the Pierre plaintiffs alleged that the Port's conduct violated, respectively, 42 USC section 1981, 42 USC section 2000d, and 42 USC section 1983. In

---

[1] Although we have not found a case expressly addressing the issue, we understand that the duty to defend may arise from the allegations in an original complaint or, having not arisen in an original complaint, may later arise as a result of the filing of an amended complaint. Conversely, once such a duty has arisen, it may be extinguished by the filing of a subsequent amended complaint. In short, the duty to defend arises from, and persists only during the effective period of, a complaint containing allegations of conduct that is covered by the applicable insurance policy or indemnity agreement.

their fourth claim for relief, they alleged that the Port was negligent in failing reasonably to supervise or train the starters and in failing to conduct a reasonable investigation in response to the Pierre plaintiffs' complaints. In their fifth and six claims for relief, they alleged, respectively, that the Port intentionally interfered with their business relations and breached the covenant of good faith and fair dealing. On each claim, each plaintiff sought $75,000 in economic damages—specifically, loss of earnings—and $350,000 in noneconomic damages plus injunctive relief, attorney fees, and costs.

The Port tendered its defense of the action to Starplex and its insurers. When Starplex failed to respond after five months, the Port informed Starplex's legal counsel that it understood that Starplex had refused its tender and that, accordingly, the Port would proceed with its own defense and would consider Starplex to be in breach of contract.

Shortly after the Port's original tender, the Pierre plaintiffs filed an amended complaint in which they added Starplex as a defendant, referred to the starters as Starplex's rather than the Port's employees, and alleged that, at all material times, Starplex acted pursuant to a contract with the Port and as the Port's agent. The Pierre plaintiffs' general allegations otherwise were unchanged from their original complaint, and they again asserted claims for relief under 42 USC sections 1981, 1983, and 2000d; in regard to the section 1983 claim, they alleged that Starplex was acting jointly with the Port and hence under color of state law. The Pierre plaintiffs also reasserted their claims for negligence, intentional interference with business relations, and breach of the covenant of good faith and fair dealing.

The following year, the Pierre plaintiffs filed their second amended complaint. As pertinent here, it alleged that the starters' supervisors, as well as the starters, engaged in the alleged discriminatory conduct. It also added an allegation that the starters and their supervisors demanded bribes, gratuities, and kickbacks from the Pierre plaintiffs based on their race and national origin; alleged that the discriminatory conduct continued after the Pierre plaintiffs' filing of the action; and alleged that, while the action was pending, an

employee and supervisor of the Port made discriminatory statements to one of the plaintiffs. The Pierre plaintiffs reasserted the claims for relief asserted in their first amended complaint, with the exception of their claims under 42 USC section 2000d.

Two months later, the trial court granted the Port's and Starplex's motions for summary judgment on the Pierre plaintiffs' claims under 42 USC section 1981 for discrimination based on national origin and for breach of the covenant of good faith and fair dealing. That same month, the Pierre plaintiffs filed their third amended complaint, in which they added a general allegation to the effect that, through Starplex, the Port "enforced * * * racially discriminatory policies designed to force black commercial shuttle van operators out of business," by adopting a policy requiring commercial shuttle vans to be moving at all times and "primarily enforc[ing that policy] against black commercial shuttle van operators." The Pierre plaintiffs added a claim for punitive damages in the amount of $500,000 to their race-based section 1981 claim and reasserted their claims under section 1983 and for negligence and intentional interference with business relations.

The Port's insurer, National, incurred approximately $161,000 in defending the Port. The trial court directed verdicts in favor of the Port and Starplex on the Pierre plaintiffs' claims for negligence and under section 1981, in favor of Starplex on the Pierre plaintiffs' claims under section 1983, and in favor of the Port on the Pierre plaintiffs' claims for intentional interference with business relations and under section 1983 to the extent that the latter claim was based on the conduct of a particular Port employee.

The jury returned verdicts on the remaining issues in the case. Specifically, in the section of the verdict forms captioned "Steering," the jury found that Starplex employees "intentionally discriminate[d]" against the Pierre plaintiffs by steering customers away from them based on their race or national origin; that Starplex intentionally interfered with the Pierre plaintiffs' business relationships based on their race or national origin; and that the Port intentionally discriminated against the plaintiffs by impairing their ability to

contract with fare-paying customers based on the plaintiffs' race or national origin. In the section of the verdict forms captioned "Hostile Environment," the jury found that Starplex employees and the Port intentionally discriminated against the plaintiffs by creating a hostile work environment based on the plaintiffs' race or national origin. The jury found that, as to the damages caused by the Port's and Starplex's conduct constituting "steering," the Port caused 35 percent of those damages and Starplex caused 65 percent. The trial court entered judgment in favor of the Pierre plaintiffs against Starplex on the plaintiffs' claim for intentional interference with business relations and against the Port on the plaintiffs' section 1983 claim. The court awarded damages against the Port in the amount of approximately $59,000 and attorney fees in the amount of $183,000. After filing an appeal, the Port settled the case for $125,000.

The Port then brought this action against Starplex, Scottsdale, and Nautilus. Based on the judgment entered against it in favor of the Pierre plaintiffs, the Port alleged breach of contract and common-law indemnity claims against Starplex. In addition, alleging that the Port was an additional insured under Scottsdale's and Nautilus's insurance contracts with Starplex, it alleged breach of contract claims against those entities. The Port sought damages of approximately $336,000 plus interest.

In its answer, Starplex denied the Port's allegations and asserted, as affirmative defenses, that the Port failed to state a claim, that indemnity is not available for judgments for damages and attorney fees awarded under 42 USC sections 1983 and 1988, that the Port failed to mitigate its damages because it inadequately defended against the Pierre plaintiffs' claims, and that the Port's damages were the result of acts of entities other than Starplex.

Starplex also cross-claimed against Nautilus and Scottsdale for breach of contract, breach of the covenant of good faith and fair dealing, and indemnity and contribution, based on those insurers' failure to defend and indemnify Starplex in the underlying action. Nautilus denied Starplex's allegations and asserted the affirmative defenses that the

alleged conduct was excluded from coverage, that the contract included a $10,000 deductible, and that public policy precludes coverage for acts of intentional race discrimination. Scottsdale admitted that it had a contract of insurance with Starplex and denied Starplex's other allegations; as affirmative defenses, Scottsdale asserted various contractual exclusions from coverage and a $10,000 deductible under the policy, and asserted that Starplex's indemnity and contribution cross-claims each failed to state a claim.

Starplex moved for summary judgment in its favor as to the Port's claims against it and for partial summary judgment as to its cross-claims against Nautilus and Scottsdale. The Port, Nautilus, and Scottsdale filed cross-motions for summary judgment against Starplex. The trial court issued a letter opinion in which it concluded that Nautilus and Scottsdale had a duty to defend Starplex based on allegations in the Pierre plaintiffs' complaint that, the court determined, constituted claims for defamation and disparagement.[2] The court concluded, however, that Nautilus and Scottsdale had no duty to indemnify Starplex. The court therefore granted partial summary judgment in favor of Starplex on the former issue and in favor of Nautilus and Scottsdale on the latter; it awarded Starplex $250,000.

Nautilus and Scottsdale eventually settled the Port's claims against them and those claims were dismissed.

The Port's claims against Starplex were tried to the court. After hearing evidence and argument, the court issued written findings of fact and conclusions of law. As pertinent here, the court noted that a private party indemnitor's duty to defend an indemnitee under a hold-harmless agreement is the same as a liability insurer's duty to defend its insured, regardless of whether there is an allegation of independent

---

[2] The trial court reasoned that the statements allegedly made to the Pierre plaintiffs were "derogatory and defamatory"; that, under the circumstances, they were published; and that the plaintiffs suffered special harm consisting of loss of business and wages and injury to their reputations. The trial court also reasoned that the alleged acts of the Starplex employees were potentially disparaging to the Pierre plaintiffs' goods, products, and services. The trial court concluded that the employment-related practices exclusion did not apply because to conclude that it covered all acts of Starplex employees would in effect nullify Starplex's purpose in obtaining insurance.

wrongdoing on the part of the indemnitee. The court first concluded that the agreement did not expressly require indemnification for the Port's "own acts and omissions," specifically, the Port's alleged negligence and its discriminatory conduct under section 1983—conduct that, the court concluded, could not be attributed to Starplex because Starplex was not a state actor subject to section 1983 liability. The court also applied the factors from *Southern Pac. Co. v. Layman*, 173 Or 275, 145 P2d 295 (1944), and *Blanchfill v. Better Builds, Inc.*, 160 Or App 527, 982 P2d 53, *rev den*, 329 Or 447 (1999), including Starplex's "lack of sophistication," the parties' failure to discuss the indemnity provision, the disparity in the parties' bargaining power, the fact that the Port drafted the contract, the Port's retention of control over the work site, the express provision in the contract granting the Port the opportunity to control its exposure to liability, and the limited benefit of the contract to Starplex relative to its potential liability exposure. Noting that the language of the indemnity provision would subject Starplex to liability far in excess of its expected profits from the contract, the court again concluded that the Port was not entitled to contractual indemnity. The court also concluded that the Port was not entitled to equitable indemnity because, based on the jury verdict in the underlying action, the Port's conduct was not secondary or passive; rather, the jury found that the Port intentionally discriminated against the Pierre plaintiffs. Finally, the court concluded that it would violate public policy to permit a state actor such as the Port to shift its liability to a nonstate actor through an indemnity provision. The court dismissed the Port's claims against Starplex with prejudice.

As noted, the Port appeals the judgment against it in Starplex's favor on Starplex's duty to defend and indemnify. Nautilus and Scottsdale appeal the judgment in favor of Starplex on the latter's claims against them for defense costs. We begin with the Port's appeal.

In its first assignment of error, the Port contends that the trial court erred as a matter of law in concluding that its contract with Starplex did not impose on Starplex a duty to defend the Port against the Pierre plaintiffs' claims. The Port notes that, by its terms, the indemnity provision in the contract holds the Port harmless from claims "resulting or

allegedly resulting from [Starplex's] acts, omissions, activities, or services in the course of performing this contract"; according to the Port, the conduct alleged by the Pierre plaintiffs' indisputably met that requirement. The Port also argues that the indemnity agreement as a whole triggered a duty to defend the Port. The Port contends that, as explained in *St. Paul Fire & Marine v. Crosetti Bros.*, 256 Or 576, 475 P2d 69 (1970), the scope of that duty was the same as that of a liability insurer—that is, where an injured party's claims fall partly within and partly outside the scope of an insurance contract, the insurer is obligated to defend against the entire claim, and the duty to defend is not dependent on the outcome of a case. The Port contends that, in the operative complaint in the underlying action, almost all the Pierre plaintiffs' factual allegations of discriminatory conduct involved Starplex employees, whereas allegations involving the Port primarily alleged that it enforced racially discriminatory policies "through Starplex" and that it failed adequately to respond to the Pierre plaintiffs' complaints about the resulting discriminatory conduct; accordingly, an insurer would have been, and Starplex therefore was, obliged to defend the Port.

Starplex responds that it had a duty to defend the Port only if the Port was entitled to indemnity, that the agreement at issue here does not unambiguously provide indemnity to the Port, and that, in light of other relevant interpretational considerations as set out in *Layman*, the trial court correctly construed the agreement not to require Starplex to indemnify the Port against the Pierre plaintiffs' claims for the Port's own intentional or negligent conduct; accordingly, Starplex had no duty to defend.

The Port replies that the agreement at issue sought to allocate risks between parties dealing at arm's length and does not implicate the principle that indemnity agreements in favor of a party whose sole negligence causes harm are disfavored. The Port reiterates that an indemnitor's duty to defend an indemnitee under a hold harmless agreement is the same as an insurer's duty to defend its insured. The Port distinguishes *Layman* and other cases relied on by Starplex, noting that, although the agreement in *Layman* included an indemnity clause, the court properly did not apply it to a risk

that was unrelated to the party's obligations under that agreement, whereas the agreement here was intended to indemnify the Port for the precise harm that occurred. Finally, the Port reiterates that, consistently with *St. Paul Fire & Marine*—a noninsurance contractual duty-to-defend case—where at least some of the Pierre plaintiffs' claims were covered by the indemnity agreement, Starplex had a duty to defend against all claims.

■ In *St. Paul Fire & Marine*, an action on an indemnity agreement, the court held that the standard for determining the duty of a contractual indemnitor to defend an indemnitee is the same as an insurer's duty to defend an insured. 256 Or at 580. Whether an insurer has a duty to defend is a question of law, determined by comparing the terms of the policy against the allegations in the complaint. *Marleau v. Truck Insurance Exchange*, 155 Or App 147, 152, 963 P2d 715 (1998), *aff'd*, 333 Or 82, 89, 37 P3d 148 (2001); *see also Abrams v. General Star Indemnity Co.*, 335 Or 392, 396, 67 P3d 931 (2003); *Oakridge Comm. Ambulance v. U. S. Fidelity*, 278 Or 21, 24, 563 P2d 164 (1977). If the allegations in the complaint are ambiguous or unclear but a reasonable interpretation would bring them within coverage, there is a duty to defend. *Klamath Pacific Corp. v. Reliance Ins. Co.*, 151 Or App 405, 413, 950 P2d 909 (1997), *modified on recons*, 152 Or App 738, 955 P2d 340 (1998); *see also Nielsen v. St. Paul Companies*, 283 Or 277, 280, 583 P2d 545 (1978) ("The insurer owes a duty to defend if the claimant can recover against the insured under the allegations of the complaint *upon any basis* for which the insurer affords coverage." (Emphasis in original.)); *Paxton-Mitchell Co. v. Royal Indemnity Co.*, 279 Or 607, 611, 569 P2d 581 (1977) (if a complaint contains some allegations of conduct or damage excluded from the policy but others that fall within policy coverage or can reasonably be interpreted to fall within coverage, there is a duty to defend); *Falkenstein's Meat Co. v. Maryland Casualty Co.*, 91 Or App 276, 279, 754 P2d 621 (1988) (an insurer has a duty to defend if the claimant can recover against the insured under the allegations of the complaint on any basis for which the policy affords coverage). The analysis "focuses on the *allegations* in the complaint rather than the claims identified in it[.]" *Holloway v. Republic*

*Indemnity Co. of America*, 201 Or App 376, 385, 119 P3d 239 (2005), *rev'd on other grounds*, 341 Or 642, 147 P3d 329 (2006) (emphasis in original). The reviewing court looks only at the complaint and the policy. *North Pacific Ins. Co. v. Wilson's Distributing*, 138 Or App 166, 170-71, 908 P2d 827 (1995), *rev den*, 323 Or 264 (1996) (citing *Ledford v. Gutoski*, 319 Or 397, 877 P2d 80 (1994)).

■     Thus, whether Starplex had a duty under its indemnity agreement with the Port to defend the Port against the Pierre plaintiffs' claims is a question of law that we answer by comparing the indemnity agreement against the allegations in the Pierre plaintiffs' complaints. Again, the agreement provided that Starplex would hold harmless and indemnify the Port for loss in connection with any action "resulting or allegedly resulting from [Starplex's] acts, omissions, activities, or services in the course of performing this contract." The quoted language unambiguously refers to, and entitles the Port to be held harmless for, conduct of Starplex and its employees. We therefore consider the Pierre plaintiffs' original and three amended complaints to determine whether they state allegations covered by that provision.

We conclude that each of the Pierre plaintiffs' complaints contains at least one allegation of conduct covered by the plain language of the indemnity provision. Specifically, in their original and amended complaints, the Pierre plaintiffs alleged that the employees known as starters—who were Starplex's employees—engaged in acts of illegal discrimination against the Pierre plaintiffs, including referring to them in racially offensive terms and enforcing rules of conduct against, threatening violence against, and referring customers to them based on race and national origin, as well as seeking to exclude them from working at the airport.[3] In addition, in each complaint, the Pierre plaintiffs alleged that both the defendants were negligent in failing reasonably to supervise and train the starters and in failing to conduct a reasonable investigation into the plaintiffs' complaints of discrimination;

---

[3] As previously described, those allegations by the Pierre plaintiffs formed the bases for their claims under 42 USC section 1981, 42 USC section 2000, and 42 USC section 1983.

in their fifth and sixth claims, they alleged, respectively, that both the Port and Starplex intentionally interfered with their business relations and breached the covenant of good faith and fair dealing. Thus, each of the Pierre plaintiffs' complaints includes allegations that fall within the coverage of the indemnity provision—that is, the possibility that the claims may give rise to liability "resulting from [Starplex's] acts, omissions, activities, or services in the course of performing" its contract with the Port. Starplex therefore was obliged to defend the Port against the Pierre plaintiffs' claims, and the trial court erred in concluding otherwise.

In its second assignment of error, the Port asserts that the trial court erred in concluding, as a matter of law, that Starplex had no duty under the parties' contract to indemnify the Port for its losses arising out of the underlying action. The Port acknowledges that it is entitled to indemnity for the damages awarded to the plaintiffs only to the extent that any claim on which the plaintiffs actually prevailed was within the contractual duty to indemnify. The Port contends that, nevertheless, here, it is entitled to indemnity as to the entire amount for which it settled with the Pierre plaintiffs— $125,000—because, as demonstrated by the pleadings, the evidence, the court's instructions, the parties' arguments, and the jury's verdict, its liability for that amount under 42 USC section 1983 flowed entirely from Starplex's acts in providing transportation services.

Specifically, the Port argues that the operative complaint alleged that Starplex employees discriminated against the Pierre plaintiffs and the Port failed to stop them from doing so; that there was no evidence that the Port itself directly committed any discriminatory acts giving rise to section 1983 liability; that the parties' arguments in the underlying action premised the Port's section 1983 liability (including, eventually, its liability for the Pierre plaintiffs' attorney fees) on the conduct of Starplex's employees; that the trial court in the underlying action instructed the jury that, in order to find the Port liable under section 1983, the jury must find that the Port authorized—whether by affirmative policies or practices or by "deliberate indifference"—"the discriminatory acts allegedly committed by Starplex employees"; and that, consistently with the instructions on the verdict

forms in the underlying action, as well as the verdicts themselves, the jury's findings that the Port discriminated against the Pierre plaintiffs necessarily depended on its findings that Starplex employees did so. The Port contends that, where the indemnity provision specifically provided for indemnity for loss resulting from Starplex's acts in performing the contract and where the Port's liability was premised on such conduct by Starplex's employees, the trial court erred in reasoning that the indemnity agreement failed to indemnify the Port for acts committed by Port employees themselves or for the Port's own negligence. According to the Port, its liability did not arise solely from its own tortious conduct; rather, both it and Starplex were held to be at fault. Under those circumstances, neither public policy, nor the application of the "contextual" factors set out in *Layman* and *Blanchfill*, precludes it from obtaining indemnity from Starplex.

Starplex responds that the indemnity provision does not require it to indemnify the Port for the Port's own wrongful conduct—conduct that, Starplex further asserts, the Port does not deny committing. According to Starplex, the trial court here properly followed *Blanchfill* by looking beyond the language of the indemnity provision to other contextual factors and properly concluded, based on those factors, that the parties did not intend for Starplex to indemnify the Port for the liability at issue here. Specifically, citing *Layman* and *Cook v. Southern Pac. Transp. Co.*, 50 Or App 547, 623 P2d 1125, *rev den*, 291 Or 1 (1981), Starplex asserts that the language of the indemnity agreement in this case resulted in liability that far exceeded its expected profit from the contract; that, relative to its liability arising from acts or conditions beyond Starplex's control, Starplex's own performance of the contract was highly controlled by the Port; that the agreement failed to allocate the specific risk from which liability to the Pierre plaintiffs arose; and that the parties did not enjoy an equal balance of bargaining power. Starplex also contends that it would contravene public policy to hold a nonstate actor financially responsible for the conduct of state actors who engage in unlawful discrimination.

The Port replies that this court should apply the plain language of the indemnity provision. The Port acknowledges that an indemnity agreement properly can be construed so as not to apply to losses caused by an indemnitee's

tortious conduct, but, it contends, that is proper when the losses at issue were caused *solely* by the indemnitee's own conduct—a circumstance that, the Port argues, is not at issue here.

Agreements to exonerate a party from liability or to limit the extent of the party's liability for tortious conduct are "not favorites of the court but neither are they automatically voided." *Estey v. MacKenzie Engineering Inc.*, 324 Or 372, 376, 927 P2d 86 (1996) (quoting *K-Lines v. Roberts Motor Co.*, 273 Or 242, 248, 541 P2d 1378 (1975) (internal quotation marks omitted)). An indemnity provision appearing in an agreement having a primary purpose other than indemnity itself is to be viewed as a realistic attempt to allocate business risks between the parties and is to be given a reasonable construction. *Cook*, 50 Or App at 551. Such a construction is derived from the plain meaning of the text of the agreement; where the text is ambiguous, it must be interpreted in light of the surrounding circumstances so as to effectuate the parties' intent. *Id.* (citing ORS 42.220).

A contractual provision that purports to immunize a party from the consequences of its own tortious conduct is enforceable "under limited circumstances." *Estey*, 324 Or at 376. "The court's inquiry into the parties' intent in this regard has focused not only on the language of the contract, but also on the possibility of a harsh or inequitable result that would fall on one party by immunizing the other party from the consequences of" the party's own conduct. *Id.* (citing, *inter alia*, *Layman*, 173 Or at 280). Where contractual language is "broad but indefinite—*e.g.*, referring to 'any and all claims' or 'any and all liability' without reference to particular risks or to the putative indemnitee's own conduct—the court determines the scope and enforceability of that language after assessing certain broader contextual considerations[.]" *Blanchfill*, 160 Or App at 534. Those considerations include such factors as the relative financial status of the parties, the reasonably anticipated benefit to the indemnitor of the parties' relationship, and the degree of additional liability the indemnitor assumed as a result of that relationship. *Id.* at 534-36, 540. However, the fact that one party possesses greater financial resources than the other does not itself demonstrate the existence of a disparity of bargaining power

such that a limitation of liability provision is unenforceable; for example, in the absence of unusual circumstances, where the parties were business concerns dealing in a commercial setting and they entered into an unambiguous agreement using terms commonly used in commercial transactions, the agreement was not deemed to be a contract of adhesion. *K-Lines*, 273 Or at 252-53.

██    As previously described, the indemnity provision at issue here provided that Starplex "shall hold [the] Port harmless from and indemnify [the] Port for any and all liability, settlement, loss, costs, and expenses in connection with any action, suit, or claim resulting or allegedly resulting from [Starplex's] acts, omissions, activities, or services in the course of performing this contract." By its terms, that provision is "broad but indefinite." Accordingly, to the extent that the Port seeks to apply it to liability arising out of the Port's own tortious conduct, other considerations also apply.

*Layman* is an early case illustrating the principle. There, a farmer seeking permission to construct a private road across a railroad right-of-way agreed to indemnify the railroad against "any and all loss" arising from the presence or use of the road. 173 Or at 276-77. Despite the broad language of the agreement, the court concluded that such an interpretation raised the risk of ruinous liability to a farmer due to the railroad's negligent operation of its trains—an operation over which the farmer had no control—in exchange for the "mere privilege" of passing over the railroad's tracks. *Id.* at 282-83. The court concluded that such a result could not reasonably have been intended by the parties; it therefore declined to enforce the agreement. *Id.* at 283-85.

Later, however, in *So. Pac. Co. v. Morrison-Knudsen Co.*, 216 Or 398, 338 P2d 665 (1959), the Supreme Court construed a similarly broad indemnity provision that also did not expressly address negligence to immunize the indemnitee against the consequences of its own negligence. Distinguishing *Layman*, the court explained:

"We cannot say in this matter that there is any justification for the application of the rule against harshness which warranted the result in Layman. In the case at bar there is a sharp difference between the status of [the

> indemnitor in *Layman*] and the [indemnitor here]. Here, the privilege conferred on the [indemnitor] falls far short of being a 'mere privilege' with a 'comparatively small risk.' "

*So. Pac. Co.*, 216 Or at 414. Essentially, there and in subsequent cases, the court has taken the view that such provisions will be enforced if they are not detrimental to the indemnitor to an extent that the parties could not reasonably have intended. *See id.*; *see also Travelers Indemn. v. American Ins.*, 278 Or 193, 197-98, 563 P2d 684 (1977) (rejecting the plaintiff's argument that a court will not construe an indemnity provision to apply to losses arising out of the indemnitee's own negligence; the court held that such a provision may be enforced where, as in that case, the provision is broadly worded and there is no allegation that the defendant's negligence was wanton or criminal in nature); *Waggoner v. Oregon Auto Ins. Co.*, 270 Or 93, 96-98, 526 P2d 578 (1974) (where an agreement provided for indemnification from liability for all personal injuries resulting from "any" condition of leased premises, where there was no evidence of "any great disparity between the parties in the financial sense," and where the benefit conferred on the indemnitor was not inconsequential, the indemnity provision was enforceable even as to losses resulting from the indemnitee's own negligence); *Commerce & Industry Ins. v. Orth*, 254 Or 226, 232, 458 P2d 926 (1969) ("Where there is no danger of a harsh result, and where the parties have expressed their intent with reasonable clarity, contractual immunity from a party's own negligence is a matter for negotiation."); *St. Paul Fire v. U. S. Nat. Bank*, 251 Or 377, 380-83, 446 P2d 103 (1968) (construing a broadly worded indemnity provision to cover claims arising from the negligence of the indemnitee; "[t]o hold otherwise would render the indemnification provision meaningless") (citing *Morrison-Knudsen*).[4]

---

[4] The cited cases, and virtually all others decided by the Oregon appellate courts, involved indemnity agreements that were asserted to protect the indemnitee from the consequences of its own negligence. *But see K-Lines*, 273 Or at 244 (determining that an agreement to limit a party's liability was valid as to loss based on strict liability). Here, as previously described, the jury in the underlying case found that the Port intentionally discriminated against the Pierre plaintiffs. However, in applying the *Layman* factors to determine whether to give effect to the indemnity agreement here, the parties and the trial court in this case apparently assumed that those factors were applicable regardless of the nature—whether intentional or negligent—of the Port's tortious conduct. The parties make the same

Again, the indemnity agreement between the Port and Starplex is couched in broad terms but does not expressly immunize the Port from liability for its own tortious conduct. We therefore consider whether construing it to do so would be detrimental to Starplex to such an extent that the parties could not reasonably have intended for it to do so.

We conclude that it would not. The record demonstrates that Starplex has provided services to the Port at the airport since 1985 and that it did business with the Port before that time, as well as with the State of Oregon, the cities of Portland, Tacoma, and Spokane, and numerous other public and private entities. In 1992, Starplex's revenues exceeded $2 million. In 1993, it did $150,000 worth of business with the Port. Thus, as pertinent to the relative financial status of the parties, Starplex, although it was not as large an entity as the Port itself, was an experienced business organization with substantial assets. Next, because Starplex had sole responsibility to hire, train, and fire the starters whose conduct was at issue in the Pierre litigation, the Port's business arrangement with Starplex with regard to those workers exposed the Port to additional, and different, liability than it would have been exposed to had it employed the starters directly; conversely, the circumstances that gave rise to the parties' liability to the Pierre plaintiffs were within Starplex's control. Finally, the record indicates that Starplex's revenue under the terms of the contract at issue totaled more than $1.5 million. Weighing those factors, we conclude that enforcing the indemnity provision against Starplex in this case does not produce a "harsh" result that the parties could not have intended.

█        It follows that the trial court erred in concluding that Starplex had no duty to indemnify the Port for its losses arising out of the Pierre plaintiffs' action.[5] Because we conclude

assumption on appeal and do not argue that intentional conduct must be addressed in any different way (*i.e.*, either not applying the factors at all or applying some more stringent test). Although we recognize that the Supreme Court has not been called on to apply the *Layman* factors in the context of tortious conduct of the type at issue here, we nevertheless proceed to apply those as did the trial court, on the theory that the same rationale for applying the factors exists here as does for negligent conduct.

[5] In urging us to affirm the trial court's conclusion that the Port was not entitled to indemnity, Starplex also points to the portion of the trial court judgment in

that the Port was entitled to be indemnified for its losses under its agreement with Starplex, we need not consider the Port's third assignment of error, in which it asserts that the trial court erred in determining that it was not entitled to common-law indemnity from Starplex.

We turn to the appeals of Starplex's insurers, Nautilus and Scottsdale, of the judgment against them and in favor of Starplex regarding their duty to defend Starplex against the Pierre plaintiffs' claims. Summary judgment is appropriate if the moving party—here, Starplex—has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. In resolving those issues on appeal, we review the record and all reasonable inferences that may be drawn from it in the light most favorable to the insurers, the parties opposing the motion. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

We begin with Nautilus's appeal. Specifically, we begin by considering whether the allegations in the Pierre plaintiffs' complaints triggered a duty to defend Starplex under the "personal injury" provisions of Nautilus's policy

which the trial court concluded that the conduct for which the Port was held liable under the Pierre plaintiffs' section 1983 claim "could not have been attributable to Starplex, inasmuch as Starplex is not a [s]tate actor and could not be liable under that section." According to Starplex, we should affirm the trial court on that basis alone. The Port does not address that contention.

It is axiomatic that, when a trial court bases a decision on multiple grounds, an appellant may prevail on appeal only after demonstrating that all of the bases for the court's decision were erroneous. *See Roop v. Parker Northwest Paving Co.*, 194 Or App 219, 236, 94 P3d 885 (2004), *rev den*, 338 Or 374 (2005) ("where [appellants] fail to challenge the alternative basis of the trial court's ruling, we must affirm it"). That principle does not require us to affirm the trial court's ruling here, however. That is because it is not at all apparent to us that the quoted portion of the judgment constituted a basis for the trial court's ultimate conclusion regarding Starplex's duty to indemnify the Port. In its oral ruling, the trial court discussed the issue of the shifting of liability to nonstate actors only in terms of liability for attorney fees under 42 USC section 1988—that is, Starplex's duty to defend the Port. The court noted in part that the obligation under section 1988 to pay fees is "an integral part of the remedies necessary to obtain compliance with [s]ection 1983," that "to shift to others those fees * * * would thwart the very purpose of" section 1983, and that "for that reason I will not require Starplex to defend nor to indemnify the Port for the fees incurred by the Port in this case." Nor has Starplex offered a developed explanation or directed us to any authority that would assist us in understanding the significance or relevance of the trial court's observations in regard to Starplex's duty to indemnify the Port. We therefore reject Starplex's "alternative basis" argument without further discussion.

insuring Starplex. As pertinent here, the policy included the following coverage provision:

"1.  Insuring Agreement

"a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' * * * to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. * * *"

The policy defined "personal injury," in part, as follows:

"13.  'Personal injury' means injury, other than 'bodily injury,' arising out of one or more of the following offenses:

"* * * * *

"d.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services[.]"

Nautilus contends that it had no duty to defend against the Pierre plaintiffs' second amended complaint because the allegations in that complaint did not constitute a claim for either defamation or disparagement. As to defamation, relying on *Marleau v. Truck Insurance Exchange*, 333 Or 82, 94 (2001), Nautilus argues that, although "slurs" or epithets based on race or national origin may be offensive, they do not constitute false statements of fact reflecting negatively on the character of the targeted person, thereby damaging the person's reputation. Nautilus further contends that the operative complaint lacks any allegations that any of the statements were published to third persons, that the complaint failed to allege sufficient facts to constitute a claim for slander *per se*, and that it failed to allege that the statements caused any "special harm" to the Pierre plaintiffs' reputations. As to disparagement, Nautilus argues that, consistently with Oregon law, the Pierre plaintiffs' allegations relating to racially offensive remarks did not support a claim that Starplex made any oral or written publication of material disparaging the plaintiffs' goods, products, or services.

Starplex generally responds that an insurer has a duty to defend if, notwithstanding the labels attached to

claims in a complaint, the complaint provides any basis for coverage under the relevant policy, including if the allegations are ambiguous or unclear but reasonably can be interpreted to trigger coverage. It also contends that insurance policies are to be liberally construed to "maximize" coverage.

More specifically, Starplex argues that, consistently with *L & D of Oregon, Inc. v. American States Ins. Co.*, 171 Or App 17, 24, 14 P3d 617 (2000), racial slurs and epithets, the sole purpose of which is to demean and disparage, are effectively defamatory by nature; moreover, for the same reason, the court need not consider whether they are false. As to publication, Starplex contends that the Pierre plaintiffs' complaint adequately asserted that element by alleging that the starters' discriminatory statements were made at the airport during the time that the plaintiffs were providing shuttle services and that the starters' supervisors knew or should have known of the statements; Starplex argues that those allegations "suggest" that the statements were made in front of potential customers and supervisors and that any ambiguity must be resolved in favor of coverage. Starplex also points to the fact that the complaint alleges, in part, that the starters and their supervisors "referred to" the Pierre plaintiffs in racially offensive terms; Starplex contends that the locution "referred to" also suggests that the remarks were made in front of third persons. It contends that, in any event, even if the racial slurs and epithets were "merely shared among" the starters and their supervisors, that would be sufficient to constitute publication. Finally, Starplex argues that the complaint contained sufficient allegations of special harm—namely, the Pierre plaintiffs' allegations that the Port and Starplex tried to force the plaintiffs out of business, intentionally interfered with their business relations, and, as a result, caused a loss of earnings of $75,000 per plaintiff.

Next, Starplex contends that the complaint's allegations were sufficient to trigger the duty to defend under the policy's coverage of disparagement. It notes that the term is not defined in either policy and that its plain meaning is "to lower in rank and estimation by actions or words" and "to speak slightingly of." Starplex argues that the Pierre plaintiffs' allegations that the starters referred to them in racially

offensive terms and that, as a result, they suffered "humiliation, shock, and outrage" and lost earnings, were well within that plain meaning. Nor, Starplex contends, was the complaint required specifically to allege disparagement of the Pierre plaintiffs' goods, products, and services; consistently with cases in other jurisdictions and with the principle that coverage provisions must be liberally construed, statements that disparaged the Pierre plaintiffs themselves were sufficient to constitute statements that impaired their business. Starplex notes that various courts have interpreted policy coverage of disparagement and personal injury to include coverage of claims of intentional interference with business relations, civil rights violations, and several forms of discrimination. Finally, Starplex argues that, where each insurer settled with the Port on the same policy for the Port's defense costs based on equivalent underlying allegations, each insurer is estopped from denying coverage to Starplex.

Nautilus replies that, consistently with *Brewer v. Erwin*, 287 Or 435, 457, 600 P2d 398 (1979), racial slurs alone are insufficient to give rise to a claim for defamation. It reiterates that the Pierre plaintiffs' complaint did not allege publication of the statements to third persons or that they damaged the Pierre plaintiffs' reputation or caused them any economic or special harm. Nautilus contends that the out-of-state authorities relied on by Starplex are distinguishable and that Oregon cases support its position. Nautilus also replies that, as a factual matter, the Pierre plaintiffs' complaints did not include any allegations relating to disparagement, much less allegations that disparaging statements interfered with the plaintiffs' businesses. Finally, it urges us not to consider Starplex's estoppel argument, which, it contends, was not raised below.

Similarly to our analysis regarding Starplex's duty under its indemnity agreement with the Port to defend the Port against the Pierre plaintiffs' claims, in determining whether Nautilus had a duty to defend Starplex at any point in the Pierre litigation, we compare each of the Pierre plaintiffs' complaints to the relevant policy provision. Again, we do so to determine whether there is a "possibility" that the allegations stated in any or all of those complaints is covered

under the policy; if a reasonable interpretation of the allegations would bring them within coverage, there is a duty to defend, at least so long as such allegations remain operative. *See Paxton-Mitchell Co.*, 279 Or at 611; *Falkenstein's Meat Co.*, 91 Or App at 279. As previously noted, "[t]he analysis focuses on the *allegations* in the complaint[s] rather than the claims identified in it." *Holloway*, 201 Or App at 385 (emphasis in original). Whether a complaint states a claim within the coverage of an insurance policy is a question of law. *Laminated Wood Products v. Pedersen*, 76 Or App 662, 668, 711 P2d 165 (1985), *rev den*, 300 Or 722 (1986). If any allegation or claim gives rise to coverage, even if other allegations or claims are excluded from coverage, the insurer must defend against all claims asserted. *Abrams*, 335 Or at 397-400 (citing *Ledford*, 319 Or at 402-05; *Ferguson v. Birmingham Fire Ins.*, 254 Or 496, 506-07, 460 P2d 342 (1969)).

We begin with the question whether the allegations in the Pierre plaintiffs' complaints potentially stated a claim for defamation. The elements of a claim for defamation are: (1) the making of a defamatory statement; (2) publication of the defamatory material; and (3) a resulting special harm, unless the statement is defamatory *per se* and therefore gives rise to presumptive special harm. *L & D of Oregon, Inc.*, 171 Or App at 22.

A defamatory statement is one that would subject another to "hatred, contempt or ridicule * * * [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other]." *Marleau*, 333 Or at 94 (quoting *Reesman v. Highfill*, 327 Or 597, 603, 965 P2d 1030 (1998) (internal quotation marks omitted; brackets in *Marleau*)). Spoken words, *i.e.*, slander, are actionable *per se* in Oregon if, among other categories of statements, they are words "tending to injure the plaintiff in his or her profession or business * * *." *Id.* at 95.[6] Such words must cast aspersions

---

[6] Other categories of statements that are defamatory *per se* are imputations of moral turpitude, imputations of infection with a contagious disease, and false statements regarding a person's fitness to perform official or job duties. *L & D of Oregon, Inc.*, 171 Or App at 24.

on the plaintiff's ability to perform essential functions, or must assert that the plaintiff lacks a characteristic necessary to successful performance, of his or her job. *L & D of Oregon, Inc.*, 171 Or App at 25-26. As noted, if a statement does not constitute slander *per se,* the plaintiff must allege special harm. *Marleau,* 333 Or at 94-95; *L & D of Oregon, Inc.*, 171 Or App at 22. The inability to obtain employment that the plaintiff would have obtained but for the currency of the slander constitutes special harm. *Benassi v. Georgia-Pacific,* 62 Or App 698, 705, 662 P2d 760, *adh'd to as modified on recons,* 63 Or App 672, 667 P2d 532, *rev den,* 295 Or 730 (1983) (citing *Restatement (Second) of Torts* § 575 comment b at 198 (1965)).

We conclude that there were sufficient allegations in each of the Pierre plaintiffs' complaints that, reasonably interpreted, possibly gave rise to coverage under Nautilus's policy—specifically, coverage of defamation claims. First, each of the complaints included allegations that the starters referred to the Pierre plaintiffs "in racially offensive terms" and that the defendants used "racial epithets." Those allegations were sufficient to show that statements made by the Starplex starters were defamatory under the definition of such statements set out above. In addition, where each complaint alleged that the statements "referred to" the Pierre plaintiffs in those terms, that the statements were made at the airport, that the Pierre plaintiffs suffered "humiliation" as a result, that the statements were intended to interfere with the Pierre plaintiffs' business relations, and that the plaintiffs lost business as a result, we conclude that, for purposes of the duty to defend, the complaints adequately alleged or gave rise to an inference that the statements were published to third parties. Finally, even assuming that the statements were not defamatory *per se* because, on their face, they lacked the required nexus to the Pierre plaintiffs' competence to perform their jobs, we agree with the trial court that the Pierre plaintiffs alleged special harm in the form of detriment to their business operations.

The cases relied on by Nautilus are not to the contrary. First, in *Brewer,* the court held that "insults * * * and offensive jokes that persons are expected to endure under

contemporary standards of behavior" are not sufficient predicates for the tort of intentional infliction of emotional distress, the gravamen of which is the deliberate infliction of actual mental suffering on the plaintiff. 287 Or at 457. Here, by contrast, the issue is whether the conduct of the Starplex employees as alleged by the Pierre plaintiffs could have given rise to a claim for defamation, the elements of which, as discussed above, relate to diminishment of the plaintiffs in the eyes of third parties. Accordingly, the court's analysis in *Brewer* is not applicable.

Nor does *L & D of Oregon, Inc.*, militate for a different result. There, the plaintiff in the underlying action brought claims against the insured for employment discrimination and intentional infliction of emotional distress, among other claims, based on allegations that his coworkers directed racist and derogatory jokes and comments to him. 171 Or App at 19-23. The court agreed that the statements were defamatory and assumed without deciding that they were published. *Id.* at 24. However, the statements as alleged neither called into question the underlying plaintiff's ability to perform his work nor asserted that he lacked some characteristic necessary to perform his work; they therefore did not constitute slander *per se*. *Id.* at 24-26. And, the complaint did not allege any "special harm" of the type required in the context of defamation claims. *Id.* at 26-28. The insurer therefore had no duty to defend.

By contrast, here, the Pierre plaintiffs' complaints adequately alleged damages of a kind that constitutes "special harm" for defamation purposes. Specifically, as previously discussed, each of the Pierre plaintiffs alleged that, as a result of the defamatory conduct of the defendants in that case, the plaintiff lost earnings from shuttle van customers in the amount of $75,000. *See Restatement (Second) of Torts* § 575 comment b (special harm for the purpose of a defamation claim is the loss of something having an economic or pecuniary value, such as a failure to realize a reasonable expectation of gain); *id.* at § 622A (defamation is a legal cause of special harm if it is a substantial factor in bringing about the harm).

Because we conclude that the allegations in the Pierre plaintiffs' complaints gave rise to possible liability for covered conduct constituting defamation, we need not determine whether allegations in the complaints gave rise to possible liability for disparagement. The trial court did not err in concluding that allegations in the Pierre plaintiffs' complaints stated a possible covered claim for defamation under Starplex's policy with Nautilus.

█ We turn, then, to whether coverage nevertheless was excluded under the policy's employment-related practices provision. That exclusion, added by endorsement, provided:

"This insurance does not apply to:

" 'Bodily injury' or 'personal injury' to:

"(1) A person arising out of any:

"(a) Refusal to employ that person;

"(b) Termination of that person's employment; or

"(c) Employment-related practices, policies, acts, or omissions, such as coercion, demotion, evaluation, reassignment, discipline, harassment, humiliation or discrimination directed at that person[.]

"* * * * *

"This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or to repay someone else who must pay damages because of the injury."

Relying on this court's analysis of a similar provision in *Clinical Research Institute v. Kemper Ins. Co.*, 191 Or App 595, 84 P3d 147 (2004), Nautilus argues that the exclusion is not limited to conduct directed at employees. It contends that, in this case, the portion of the exclusion relating to personal injury to a person arising out of "discrimination directed at that person" properly applies. Starplex responds that such exclusions ordinarily apply to conduct directed at a potential, current, or former employee—that is, to conduct relating to the employment relationship between an

employee and an employer—and that, at the time of the conduct alleged here, the Pierre plaintiffs fit none of those categories; Starplex reasons that to construe the exclusion as applying to any conduct merely involving an employee would defeat virtually all coverage. It also argues that, to the extent that the provision is ambiguous, it must be construed in favor of coverage.

We interpret that provision according to the analytical framework set out in *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 836 P2d 703 (1992). We first determine whether the policy itself defines the term at issue; if it does not, we determine its plain meaning. If there are two or more interpretations of the term that are plausible in light of the context in which the term is used and in the context of the policy as a whole, we construe the term against its drafter. *Id.* at 470-71.

*Clinical Research Institute* provides substantial guidance. In that case, a former employee brought a defamation claim against the insured. The insurer refused to defend, and the insured sought a declaration that the claim was covered under its policy with the insurers. 191 Or App at 597. At issue was the applicability of an exclusion for personal injury to a person "arising out of [e]mployment-related practices, policies, acts, or omissions"—precisely the same phrase that is at issue here. Like the policy here, the policy in *Clinical Research Institute* defined neither the phrase nor its constituent terms.

Applying the interpretational methodology set out in *Hoffman Construction Co.*, this court first determined that, by its terms, the term "arising out of" connotes "a causal connection with its subject and a concomitant broadening in the scope of the subject." 191 Or App at 601. We next determined that, by its plain meaning, the term "employment-related" means connected or linked to employment. Next, we determined the manner and extent of that connection—such as temporal or otherwise—by consideration of the context in which the term was used, as well as the broader context of the policy as a whole. *Id.* at 601-02. We concluded that, although most of the practices expressly enumerated in the

employment-related practices portion of the exclusion ordinarily were applicable only to current employees, other portions of the exclusion as a whole applied to potential employees ("[r]efusal to employ the person") and to previous employees ("[t]ermination of the person's employment"). Accordingly, we concluded that the exclusion as a whole did not apply only to current employees. *Id.* at 602-05. We noted that that conclusion was supported by the fact that, by its terms, the exclusion applied "[w]hether the insured may be liable as an employer or in any other capacity"; we reasoned that the wording "appears to encompass actions in which there is no *existing* employment relationship" and the underlying plaintiff is merely a "former employee." *Id.* at 604 (emphasis added). We also noted that, in contrast to the coverage provisions of the policy, the exclusion referred to injury to "persons" rather than "employees"; we understood that feature to mean that the exclusion had broad applicability.

As noted, the wording of the exclusion in this case is virtually identical to the wording at issue in *Clinical Research Institute*. However, the question here is not whether it applies to all employees, including past, current, and future employees; the question is whether it applies to nonemployees. Nothing in the analysis of the language in *Clinical Research Institute* suggests that the relevant wording, albeit broad, applies to nonemployees. As discussed above, in that case, the court determined that the term "employment-related" means connected or linked to employment, whether past, current, or future. However, the Pierre plaintiffs were not employed by either of the defendants in the Pierre litigation. Accordingly, the trial court's conclusion that the employment-related practices exclusion did not apply here was correct. Because the Pierre plaintiffs' allegations potentially gave rise to a covered claim and the employment-related practices exclusion did not apply, the trial court did not err in granting summary judgment in Starplex's favor on its claim for breach of the duty to defend.

We turn, finally, to Scottsdale's appeal of the equivalent ruling relating to its duty to defend Starplex in the Pierre litigation. The relevant coverage provision provided:

"1.  Insuring Agreement

"a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' * * * to which this insurance applies * * *.

"b.  This insurance applies to:

"(1)  'Personal injury' caused by an offense arising out of your business * * *."

The Scottsdale policy defined "personal injury" as

"injury, other than 'bodily injury' arising out of one or more of the following offenses:

"* * * * *

"(d)  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services[.]"

The employment-related practices exclusion provided:

"This insurance does not apply to:

" 'Personal injury' to:

"(1)  A person arising out of any:

"(a)  Refusal to employ that person;

"(b)  Termination of that person's employment; or

"(c)  Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

"(2)  The spouse, child, parent, brother or sister of that person as a consequence of 'personal injury' to that person at whom any of the employment-related practices described in paragraphs (a), (b), or (c) above is directed.

"This exclusion applies:

"(1)  Whether the insured may be liable as an employer or in any other capacity; and

"(2)  To any obligation to share damages with or repay
      someone else who must pay damages because of the
      injury."

As did Nautilus, Scottsdale contends that the Pierre
plaintiffs' allegations did not state a claim for defamation or
disparagement and that the employment-related practices
exclusion applied. As can be seen, however, the Scottsdale
policy is the equivalent of the Nautilus policy in all relevant
respects, including its coverage provisions and the relevant
exclusion. Having determined that Nautilus had a duty to
defend Starplex in the Pierre litigation, we reach the same
conclusion with regard to Scottsdale. The trial court did not
err in granting summary judgment to Starplex on its claim
against Scottsdale for breach of the duty to defend.

On National Union Fire Insurance Company of
Pittsburgh Pennsylvania and Port of Portland's appeal,
reversed and remanded for entry of judgment in favor of
appellants; on Scottsdale Insurance Company's and Nautilus
Insurance Company's appeals, affirmed.